**Don C. SILVERTHORNE, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 21221.**

United States Court of Appeals
Ninth Circuit.

Aug. 27, 1968.

Rehearing Denied Sept. 23, 1968.

For the Bennett case see 399 F.2d 740.

**630**

George C. Martinez (argued), San Francisco, Cal., for appellant.

Cecil F. Poole (argued), U. S. Atty., Jerrold M. Ladar, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before BARNES, HAMLEY and JERTBERG, Circuit Judges.

BARNES, Circuit Judge:

Appellant Don C. Silverthorne was convicted of violating 18 U.S.C. §§ 656 and 1005; the misapplication of bank funds and the making of false entries in bank records, respectively. The primary error urged by Silverthorne in this appeal is that the trial court failed to ascertain, during the voir dire examination and at certain specific points in the trial, whether, in light of massive news-media publicity which antedated and which was contemporary with the trial, the jurors bore any prejudice toward appellant. Further assignments of error related to the claimed prejudicial publicity are the denials by the district court of a motion to dismiss the indictment and a motion for continuance. In addition, Silverthorne asserts the commission of sixteen other errors by the court below, including the denial of a motion to sever.[1] We have carefully studied the additional allegations of error and find them to be without merit. However, our evaluation of the publicity surrounding appellant's trial and the methods and procedures adopted by the trial court with respect thereto, compel the conclusion that appellant was not accorded a fair trial, free from prejudice or, as the more recent cases require, free from the probability of prejudice.[2]

---

1. The 39-count indictment named Silverthorne and one William S. Bennett as co-defendants and coconspirators. One count of the indictment changed a conspiracy to violate the federal banking laws. Both defendants were acquitted thereon. The remaining 38 counts charged the defendants, alternatively, with acting as a principal and with aiding and abetting the other in violating the banking laws. Prior to the trial, the government dismissed six counts. Of the 32 remaining counts on which the case went to trial, Silverthorne was convicted on each count in which he was alleged to have acted as principal and acquitted on each count in which he was alleged to have aided and abetted Bennett. Bennett was convicted on one count in which he was alleged to have been the principal offender and was acquitted on all counts in which he was alleged to have aid and abetted Silverthorne.

2. Rideau v. State of Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Pamplin v. Mason, 364 F.2d 1 (5th Cir. 1966).

Accordingly, we reverse the judgment of conviction.

The San Francisco National Bank was authorized to begin doing business in June, 1962 with a capitalization of $4,500,000. Silverthorne was the president and principal organizer of the bank. At the end of the year 1964, the bank's statement reflected assets of some $54,000,000. On January 22, 1965, the bank was ordered closed by the United States Comptroller of Currency because of insolvency. Beginning on that day and continuing through appellant's trial during January and February, 1966, the San Francisco Bay area newspapers were saturated with more than 300 articles concerning Silverthorne and the alleged reasons for the closing of the bank. Radio and television coverage was likewise extensive.

The publicity Silverthorne received could not, of course, be avoided: a bank failure of the proportion here present, the nature of the closing, the criminal charges filed against Silverthorne in the state courts,[3] his testimony and the testimony of witnesses against him before the investigating committee of the Senate Committee on Governmental Operations, the indictment returned by the federal grand jury, Silverthorne's flamboyant and bizarre conduct including his marital and gambling activities with losses of almost one-half million dollars, the civil suit filed against him by the Federal Deposit Insurance Corporation predicated on Silverthorne's alleged malfeasance, and the resignation of Silver-

thorne's attorney and the latter's filing suit against him for unpaid attorney's fees, all made certain there would be a great plenitude of publicity concerning this federal trial. While much of the publicity was adverse to codefendant Bennett, it was particularly adverse to Silverthorne. In a trial such as this, after the occurrence of such circumstances as are briefly related above, it would have been impossible to avoid public interest, scrutiny and publicity: it is most doubtful that publicity adverse to Silverthorne could have been avoided.[4]

We are not concerned with the fact of publicity but with the assessment of its nature.[5] We concentrate, therefore, on (a) whether the publicity was such as to require the court to grant Silverthorne's motions for dismissal or for a continuance, and (b) whether the trial judge and counsel for both sides did all the law requires to ascertain if there was (and if so, to avoid or minimize) prejudice to Silverthorne in the eyes of the jury.

### The Motions

Silverthorne's counsel filed a motion to dismiss the indictment under Rule 12, Federal Rules of Criminal Procedure, on the ground that highly prejudicial publicity had infected the grand jury's deliberations. That motion pointed out that (1) Silverthorne was charged before the Senate subcommittee with "certain unspecified crimes"; (2) that evidence which was inadmissible at his trial had been introduced at the subcommittee hearings, and thereafter publicized in daily local papers and in

---

3. Silverthorne was indicted for the passing of worthless checks in the amount of $25,000 in People v. Silverthorne, No. 65067, in the Superior Court of California, in and for the County of San Francisco. The trial of that case was in progress when the case was dismissed by the Superior Court judge because of prejudicial publicity which appeared in the Wall Street Journal, November 5, 1965, and in the San Francisco Chronicle, November 6, 1965.

4. Words such as "political donations", "scandal", "perjury", "million dollar losses", etc. commonly appeared.

5. For purposes of determining the scope of the publicity, it was stipulated by the United States Attorney and by appellant's counsel that television Channel 4, in San Francisco, was viewed in that city and in eight surrounding counties; that television Channel 5, also in San Francisco, was viewed in an area larger than that of Channel 4, and that the two principal newspapers in San Francisco, The Chronicle and The Examiner, had a combined week-day circulation of three-quarters of a million and a Sunday circulation of over a million.

national magazines; (3) that the United States Attorney had accused appellant of acts of misconduct not charged in the indictments (to the effect that he had allegedly misappropriated bank funds to pay gambling debts, that he was under investigation for income tax evasion), and had expressed a personal belief in the defendants' guilt; and (4) that at least two governmental officials had been quoted by the press as expressing belief Silverthorne was guilty[6] of unlawful banking activities, gross misconduct and deception. Silverthorne's sworn affidavit, attached to the motion to dismiss, was accompanied by some 116 exhibits of alleged adverse publicity, some consisting of four or five articles in one exhibit.[7] The United States Attorney requested the court's permission to file an answer to the "conclusory portion of the affidavits now on file by counsel so that it would not appear * * [the government] failed [sic] to acquiesce or failed to object to them. * * * " However, the court apparently did not act on the request of the Government by way of any order. Nowhere in the record can be found affidavits from the Government contesting or contradicting the affidavits filed by the appellant.

The record does contain, however, a government memorandum in opposition to the motion to dismiss. This pleading relies on two points, the first that there existed no proof that the indictment rendered by the grand jury was influenced in any way by the publicity cited, and the second, that some of the publicity had to do with the bank and not with the appellant, and that "statements made by the United States Attorney at the time of the returning of the indictments, *when viewed in context,* should not in any way be prejudicial to the defendant *at the time of the trial.*" (Emphasis added.) The memorandum

expressed that "the statements made by the United States Attorney were not a deliberate and structured or prolonged intent to inflame public opinion, but * * were statements made on the return of the indictment * * *."

Appellant relies on the much-cited case of Delaney v. United States, 199 F.2d 107 (1st Cir. 1952) in support of his position that the indictment should have been dismissed by the trial court because the grand jury deliberations were infected by prejudicial publicity arising out of actions by government agencies and agents. Delaney was a district collector of Internal Revenue. He was indicted and convicted of certain criminal acts engaged in during his term of office. Following the return of the federal indictment against Delaney, an investigation of his office was undertaken by a Senate subcommittee on the administration of Internal Revenue laws. Public hearings were held, and the publicity attendant thereto was nationwide and most adverse to Delaney. Two months after the conclusion of the Senate hearings Delaney's case went to trial, over his objection and after the denial of two motions for continuance.

In reversing Delaney's judgment of conviction because the district court failed to grant a continuance in the wake of the prejudicial Senate hearings, *instigated by the United States Government,* the Court of Appeals said:

"[S]o far as our present problem is concerned, we perceive no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial publicity instigated by the United States through its legislative arm. The prosecution is by the 'United States of America' against Denis W. Delaney. After the United States has imposed this burden upon the defendant, by

6. James J. Saxon, Comptroller of Currency, and Arnold E. Larsen, Regional Comptroller of Currency, San Francisco.

7. It is of interest to note that in support of codefendant Bennett's motion to sever,

his counsel urged: "Mr. Bennett should not have thrust upon him the burden of going to trial with a codefendant who has been the target for obliquity in the public press."

making it difficult to determine his guilt or innocence solely on the basis of evidence to be presented at the impending trial, it seems to us neither right, nor in harmony with the spirit of the Sixth Amendment, for the United States to make him stand trial while the damaging effect of all that hostile publicity may reasonably be thought not to have been erased from the public mind." 199 F.2d at 114.

It is appellant's position that the adverse publicity in the instant case, instigated by a Senate committee and by officers of the federal government, bears the same relation to the grand jury deliberations as the prejudicial publicity in *Delaney* bore to the trial on the merits: it is as improper to sanction the indictments herein as it was to sanction a guilty verdict in *Delaney*.

Of course it goes without saying that a pertinent distinction exists between the Senate investigations commencing *after* a federal indictment and those undertaken *before* a federal grand jury acts. In the former case, Congress is most certainly warned that its actions may well affect an impending trial. But such a distinction is not the complete answer to the question. Other considerations become manifest, and we think the *Delaney* court, in broaching the problem now before us, provides us with a proper guideline for decision:

"We limit our discussion to the case before us, and do not stop to consider what would be the effect of a public legislative hearing, causing damaging publicity relating to a public official not then under indictment. Such a situation may present important differences from the instant case. In such a situation the investigative function of Congress has its greatest utility: Congress is informing itself so that it may take appropriate legislative action; it is informing the Executive so that existing laws may be enforced; it is informing the public so that the democratic processes may be brought to bear to correct any disclosed executive laxity. Also, if as a result of such legislative hearing an indictment is eventually procured against the the public official, then in the normal case there would be a much greater lapse of time between the publicity accompanying the public hearing and the trial of the subsequently indicted official than would be the case if the legislative hearing were held while the accused is awaiting trial on a pending indictment." 199 F.2d at 115.

■ We do not perceive the impropriety in the Senate hearings in the case before us which was found by the *Delaney* court. While the reversal in *Delaney* was necessitated because of the *fact* of prejudicial publicity, this result is inextricably bound up in the rationale that such publicity was caused by the action of the United States Government at a time when restraint would have been the more prudent course of action. Federal courts have been sensitive to claims of prejudice arising from publicity when that publicity is created by acts of the Government. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); United States v. Milanovich, 303 F.2d 626 (4th Cir. 1962); Holmes v. United States, 284 F.2d 716, 97 A.L.R.2d 782 (4th Cir. 1960); Massicot v. United States, 254 F.2d 58 (5th Cir. 1958). In reviewing the case before us, we think it significant that the Senate committee investigating Silverthorne's activities undertook its lawful function in the absence of circumstances which would have cautioned abstention.

In so concluding, we are left with but the *fact* of prejudicial publicity arising from the hearings. The indictment returned against Silverthorne was handed down by the grand jury more than five months after the conclusion of the Senate investigation. We have no way of knowing what effect the news-media reporting had on the grand jurors. Even had the district court permitted the appellant to inspect the grand jury minutes we are unable to see how the written transcript could have afforded counsel or the

trial judge any basis for the objective assessment of the existence of prejudice toward appellant in the minds of the grand jurors.

We are unable to appreciate Silverthorne's argument. The Senate investigation was, among other things, initiated for the purpose of "informing the Executive so that existing laws may be enforced." In this respect the Senate committee and the federal grand jury are associates in exposing criminal activity and moving toward its curtailment. What illegality the Senate committee uncovers cannot become the forbidden fruit of the grand jury's consideration merely because in the process of uncovering, prejudice to the perpetrator may accrue. Furthermore, a great many, if not all, the witnesses who testified at the Senate investigations undoubtedly appeared before the grand jury which returned Silverthorne's indictment. Indeed, a number of Silverthorne's transactions with individuals who appeared before the Senate committee were alleged as counts of the indictment. It would be most difficult for us to conclude, under the facts of this case, that the grand jury was motivated by facts or circumstances other than those which were presented to it.

■■ Our conclusion that appellant was not prejudiced by grand jury indictment is further supported by the fact that the grand jury deliberates and indicts, as an accusing body, on the standard of "reasonable probability" that a crime has been committed by some person. It is not a trial body. United States v. Atlantic Comm'n Co., 45 F.Supp. 187, 192 (E.D.N.C.1942). The quantum of evidence necessary to indict is not as great as that necessary to convict. If a grand jury is prejudiced by outside sources when in fact there is insufficient evidence to indict, the greatest safeguard to the liberty of the accused is the petit jury and the rules governing its determination of a defendant's guilt or innocence. And, if impartiality among the petit jurors is wanting, the cure is reversal by the appellate courts.

■ On December 20, 1965, the trial court denied Silverthorne's motion for continuance, which motion was predicated on the ground that it was necessary to delay the trial to permit adverse publicity to abate. The denial of this motion was in the sound discretion of the trial court and a denial of such a motion, prior to the voir dire examination, is not an abuse of that discretion. United States v. Medlin, 353 F.2d 789 (6th Cir. 1965), cert. denied, 384 U.S. 973, 86 S.Ct. 1860, 16 L.Ed.2d 683, reh. denied, 385 U.S. 889, 87 S.Ct. 14, 17 L.Ed.2d 123 (1966).

In contemplating the *effect* of the publicity on the public, we note that on September 9, 1965, the day the federal indictments were returned against Silverthorne and four months before his trial began, one of the newspapers quoted the United States Attorney with respect to the indictment of these defendants, as follows:

"Nor * * * do the indictments cover all the misdeeds at the bank. * * * Many incidents of misapplications of funds are not being charged here. We just got to the point where we had to decide what to proceed with. * * * If we tried to trace it all, we'd be here for the rest of the terms of some of our federal judges —and their terms are for life."

The Comptroller of Currency likewise gave statements to the press:

"There can be no question that Mr. Silverthorne was engaged in improper and highly questionable, if not unlawful, banking activities. * * * It is a case of grossest misconduct and deception."

And, on another press occasion:

"He used some of the [bank's] money to finance activities like his gambling in Las Vegas."

Within a month after his indictment by the federal grand jury, Silverthorne was sued by his attorney, who had resigned from his case, for attorney's fees, and noncomplimentary quotations by the attorney about Silverthorne were pub-

licized.[8] One newspaper went so far as to discuss Silverthorne's guilt in sarcastic overtones.[9] The November 6, 1965 article in the San Francisco newspaper which gave rise to the mistrial in the state court remarked that:

> "The furor created by the sudden collapse of the San Francisco National Bank last January—which has already touched off a Senate investigation and led to indictment of the bank's president on 79 counts of criminal violation of federal banking laws—may be mild compared with what's to come.

> "Indications yesterday were that at least $30 million, or 56 per cent of the bank's total of $54 million declared assets, may have been improperly used, mistakenly loaned, or otherwise placed beyond the immediate chance of recovery by creditors."

### Voir Dire Examination

We now turn to the impaneling of the jury on January 3, 4 and 5, 1966. A panel of 65 persons was summoned by the court. By the time 12 jurors were chosen, 43 panel members had been excused, 19 of them because they expressed an opinion as to the guilt of appellant which they had derived from reading newspapers and listening to news broadcasts. Every one of the 65 panelists related a knowledge of appellant's case.

The trial judge adopted the so-called "Arizona Plan" of voir dire examination. Counsel were not permitted to interrogate the panel members. The judge asked each of the prospective jurors, in substance, four questions concerning the publicity which antedated the trial.[10] The court's examination of the 12 jurors ultimately impaneled is set forth in the margin.[11]

---

8. " * * * [Silverthorne] will not cooperate, he will not give me sufficient information. * * * Silverthorne has withheld information and I cannot advise him properly."

9. The editorial page of the San Francisco Chronicle, March 24, 1965, offered the following observations:
 "Surely there is a strong not guilty plea to be made out in * * * [Silverthorne's] behalf, if all the allegations against him are true: "He was certainly not guilty of approving all loans at regular interests if it was at all possible to obtain an additional fee or commission. In one such instance his fee was reported to have been $100,000.
 "Nor was he guilty of inhospitality toward borrowers, on whom he sometimes pressed shares of stock in his bank, or life insurance policies, or even bracelets and other baubles as tokens of his esteem, for which payment was expected.
 "He was certainly not guilty of timidity or small time nickel-nursing in Las Vegas where, it is testified, he cashed checks or gave IOUs for $906,000 in the course of a number of forays to the crap tables."

10. (1) "Have you heard or read of the case?"; (2) "Have you heard or discussed the case with someone who purported to know something about the facts of the case?"; (3) "Would it be diffi-

cult for you to give both sides a fair and impartial trial?", or, "If you were a defendant in this case would you like to be tried by 12 jurors feeling as you do?"; and (4) "Do you now have, or have you formed, an opinion, or do you have any preconceived notion, as to the guilt or innocence of the defendants?". "If 'yes,' would it take evidence to remove, or change, that opinion?"

11. The totality of the dialogues between the jurors selected and the court concerning the publicity issue is the following:
 "THE COURT: Now as to the jurors in the front of the box, starting with Mr. Retta, have any of you, you six right here, heard of the case before?
 "JUROR RETTA: Yes, just in the newspaper.

 "THE COURT: Have any of your [sic] discussed it with anybody who purported to know the facts in the case? [No reply from Juror Retta.] I take it that all of you have not.

 "Have any of you formed any idea, or personal opinion as to the guilt or innocence of the two defendants? [No reply from Juror Retta; COURT goes on to interrogate responding juror.]
 * * * * *

 "THE COURT: Mr. Poole, did you know about the nature of the case?
 "JUROR POOLE: Only what I read in the newspaper.

The court's examination, which was, for the most part, general and not individual, was directed to the panel at large and only those jurors who took the

"THE COURT: You knew it was a criminal case?

"JUROR POOLE: Yes.

\* \* \* \* \*

"THE COURT: Mrs. Nicholson, have you heard about the case?

"JUROR NICHOLSON: Yes, I have read about it in the newspapers.

"THE COURT: And you have heard about it on the TV?

"JUROR NICHOLSON: On the news, yes.

"THE COURT: As a result, have you formed any opinion as to the guilt or innocence of the defendants?

"JUROR NICHOLSON: No.

"THE COURT: Could you give both sides a fair and impartial trial, if selected as a juror?

"JUROR NICHOLSON: I think so, yes.

"THE COURT: Have you ever discussed this case with anybody who purported to know the facts in the case?

"JUROR NICHOLSON: No.

"THE COURT: Have you ever discussed with anybody who expressed any positive opinion as to the guilt or innocence of the defendants?

"JUROR NICHOLSON: I have discussed it with my husband, after reading about it, just general discussion.

"THE COURT: Just general discussion?

"JUROR NICHOLSON: Yes.

"THE COURT: If you were selected as a juror in this case, could you give both sides a fair and impartial trial?

"JUROR NICHOLSON: I think so.

"THE COURT: If you were the defendants in this case, or either of them, would you like to have 12 jurors feeling as you do, try your case?

"JUROR NICHOLSON: Yes.

\* \* \* \* \*

"THE COURT: Mr. Bray, have you heard about the case?

"JUROR BRAY: Yes, I have read about it.

"THE COURT: Have you heard about this case before?

"JUROR BRAY: Yes, vaguely.

"THE COURT: Have you discussed the case with anybody who presumed to know the facts in the case?

"JUROR BRAY: No.

"THE COURT: You have not formed an opinion as to the guilt or innocence of the defendants?

"JUROR BRAY: No, sir.

\* \* \* \*. \*

[Jurors NOLL, JETTE and IACONA were among six panel members who were questioned generally]:

"THE COURT: Just as to you six jurors whose names have been called, have you heard about this case before? Apparently all of you have.

\* \* \* \* \*

"THE COURT: How many of you have heard of it by way of the TV and radio?

[All answer affirmatively.]

\* \* \* \* \*

"THE COURT: Have you read about it in the newspapers?

[All answer affirmatively.]

\* \* \* \* \*

"THE COURT: I will ask the same question of the other jurors, if you were a defendant in this case would you like to have 12 jurors feeling as you do try your case? First I will ask Mrs. Noll. Mrs Noll?

"JUROR NOLL: Yes.

\* \* \* \* \*

"JUROR IACONA: Yes.

\* \* \* \* \*

"JUROR JETTE: Yes.

\* \* \* \* \*

"THE COURT: Have you heard about the case before?

"JUROR HACK: Yes.

"THE COURT: Have you read about it in the paper?

"JUROR HACK: Yes.

"THE COURT: Have you heard about it on the radio and the TV?

"JUROR HACK: Yes.

"THE COURT: As a result of the information that you have received, have you formed any conclusions as to the guilt or innocence of the defendants?

"JUROR HACK: No, I haven't.

"THE COURT: Has your reading about the case been extensive?

"JUROR HACK: No.

"THE COURT: You feel you can give both sides a fair and impartial trial, if you were selected as a juror?

"JUROR HACK: I think so, yes.

"THE COURT: If you were one of the defendants, would you like to have 12 jurors feeling as you do, try your case?

"JUROR HACK: Yes.

\* \* \* \* \*

"THE COURT: Mr. Reed, have you heard about this case before?

"JUROR REED: Yes, I have.

places of those who had been excused were questioned individually, because they had not been in the courtroom when the panel was being interrogated generally. Four of the jurors ultimately impaneled never responded to the court's questions concerning their opinions of the case (footnote 10, supra), and two of those four were never questioned by the court on the publicity issue.

In assessing appellant's contention that the court's voir dire examination was inadequate to protect him from the probability of prejudice, we begin with the proposition that:

"The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print."

Patterson v. State of Colorado, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907). Believing that conclusions based *only* on the evidence and arguments satisfies due process, "our system

"THE COURT: Have you heard about it through the news media, radio and TV?
"JUROR REED: Reading, and on the TV.
"THE COURT: And in the newspaper?
"JUROR REED: Yes.
"THE COURT: As a result of your reading, have you discussed the case with anybody?
"JUROR REED: No.
"THE COURT: Have you formed any opinion as to the guilt or innocence of the two defendants on trial?
"JUROR REED: No. I haven't formed an opinion.
"THE COURT: Can you give both sides a fair trial?
"JUROR REED: Yes.
"THE COURT: If you were the defendants, or either one of them, would you like to have 12 jurors, feeling as you do, try your case?
"JUROR REED: Yes.

\* \* \* \* \*

"THE COURT: Have you heard of the case before, Mrs. Bleman?
"JUROR BLEMAN: Well, I have heard about it through the newspapers, but I didn't pay much attention to it. I haven't read much about it.

of law has always endeavored to prevent even the *probability* of unfairness." In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955) (emphasis in original). In pursuit of this end, the trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. See Holt v. United States, 218 U.S. 245, 251, 31 S.Ct. 2, 54 L.Ed. 1021 (1910).[12] But discretion is not a substitute for duty:

"Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused." Sheppard v. Maxwell, 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966).

Therefore, when pretrial publicity is great, the trial judge must exercise correspondingly great care in all aspects of the case relating to publicity which might tend to defeat or impair the rights

"THE COURT: Have you discussed it with anybody who purported to know any of the facts?
"JUROR BLEMAN: No.
"THE COURT: As a result of your reading in the newspapers have you discussed it with other people?
"JUROR BLEMAN: No.
"THE COURT: Have you formed an opinion as to the guilt or innocence of the defendants?
"JUROR BLEMAN: No. I think you have to listen to both sides before you form an opinion, and I haven't formed an opinion.
"THE COURT: If you were selected as a juror in this case you could enter into the trial of this case with a completely open mind?
"JUROR BLEMAN: Yes, Sir.
"THE COURT: If you were the defendants in this case, would you be willing to have 12 jurors feeling as you do, try your case?
"JUROR BLEMAN: Yes, sir."

\* \* \* \* \*

[Jurors GRONER and CURLEY were never questioned individually by the court on the publicity issue.]

12. Cf. Rule 24, Federal Rules of Criminal Procedure.

of an accused. The judge must insure that the voir dire examination of the jurors affords a fair determination that no prejudice has been fostered. Aldridge v. United States, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931). He must determine whether "the nature and strength of the opinion formed [if any] are such as in law necessarily * * * raise the presumption of partiality." Reynolds v. United States, 98 U.S. 145, 156, 25 L.Ed. 244 (1878).

 Appellate courts will not interfere with the manner in which the trial court conducted the voir dire examination unless there has been a clear abuse of discretion. United States v. Dennis, 183 F.2d 201 (2d Cir. 1950), affirmed, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); United States v. Lebron, 222 F.2d 531 (2d Cir.), cert. denied, 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774 (1955); Stephan v. Marlin Firearms Co., 353 F.2d 819 (2d Cir.), cert. denied, 384 U.S. 959, 86 S.Ct. 1584, 16 L.Ed.2d 672 (1965); Kreuter v. United States, 376 F.2d 654 (10th Cir. 1967).

 It is not an abuse of discretion for the trial judge to insist upon conducting a voir dire examination, but if he does so, he must exercise a sound "judicial" discretion in the acceptance or rejection of supplemental questions proposed by counsel, to be propounded by the judge, as contemplated by Rule 24(a) of the Fed.R.Crim.Procedure.

Bearing in mind these principles, we conclude that the trial court's voir dire examination did not adequately dispel the probability of prejudice accruing from the pre-trial publicity and the jury panel members' knowledge of the case. This conclusion is predicated on two grounds: (1) the questions propounded by the court to the prospective jurors were calculated to evoke responses which were subjective in nature—the jurors were called upon to assess their own impartiality for the court's benefit, and (2) the entire voir dire examination was too general to adequately probe the prejudice issue.

*(1) The Court's Questions*

 We agree with the language of the *en banc* majority in United States ex rel. Bloeth v. Denno, 313 F.2d 364 (2d Cir.), cert. denied, 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963) that in the absence of an examination designed to elicit answers which provide an objective basis for the court's evaluation, "merely going through the form of obtaining jurors' assurances of impartiality is insufficient [to test that impartiality]." 313 F.2d at 372. We find this expression to be forcefully applicable to the instant case. Each and every juror in the case before us had read or heard *something* about appellant's case. The trial court made no effort to ascertain *what* information the jurors had accumulated and, consequently, had no way of objectively assessing the impact caused by this pretrial knowledge on the juror's impartiality.[13]

 We of course recognize that "[i]t is not required * * * that the jurors be totally ignorant of the facts and issues involved. * * * To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a juror's impartiality would be to establish an impossible standard," and further, that "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence

13. See Project on Minimum Standards for Criminal Justice, American Bar Association, Standards Relating to Fair Trial and Free Press, Tentative Draft (1966) § 3.4:
"Selecting the jury.
 * * * * *
(a) Method of examination.
* * * The questioning shall be conducted for the purpose of determining what the prospective juror has read and heard about the case and how his exposure has affected his attitude toward the trial. * * *
(b) Standard of acceptability.
Both the degree of exposure and the prospective juror's testimony as to his state of mind are relevant to the determination of acceptability. * * *"

presented in court." Irvin v. Dowd, 366 U.S. 717, 722–723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). But whether a juror *can* render a verdict based solely on evidence adduced in the courtroom should not be adjudged on that juror's own assessment of self-righteousness *without something more*. United States v. Largo, 346 F.2d 253, 257 (7th Cir.) (dissenting opinion),[14] cert. denied, 382 U.S. 904, 86 S.Ct. 240, 15 L.Ed.2d 157 (1965); and compare Sheppard v. Maxwell, 346 F.2d 707, 751 (6th Cir. 1965) (dissenting opinion), reversed, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). "No doubt each juror was sincere when he said that he would be fair and impartial * * * but the psychological impact requiring such a declaration before one's fellows is often its father." Irvin v. Dowd, supra, 366 U.S. at 728, 81 S.Ct. at 1645.

In an effort to ascertain some basis upon which an objective evaluation of each juror's impartiality could be assessed, appellant's counsel requested the court to inquire of the jury what information they had obtained relative to the case and their source of knowledge. The court refused this request. We believe under the circumstances of this case the request should have been granted. Every juror had acquired *some* knowledge of the case; almost thirty per cent of those examined expressed opinions of appellant's guilt; and the voluminous pretrial publicity had been brought to the court's attention. In such an atmosphere the court should have sought the objective criteria. Cf. United States v. Bando, 244 F.2d 833 (2d Cir.), cert. denied, 355 U.S. 844, 78 S.Ct. 67, 2 L.Ed.2d 53 (1957); United States v. Kahaner, 204 F.Supp. 921 (S.D.N.Y. 1962).

### (2) *The General Voir Dire*

Had the court's inquiries been sufficiently directed to the crucial issue, we would nonetheless be compelled to observe with grave concern that only five of the jurors impaneled were questioned individually by the court.

Because of the voluminous publicity antedating appellant's trial, some of which was prejudicial in nature, and in view of the trial court's denial that any prejudice existed because of the pretrial publicity, the court's voir dire examination should have been directed to the individual jurors. In light of this publicity, we would *prefer* to apply the rule that prevails when prejudicial matter is brought to the jury's attention during the course of the trial:

"* * * [T]he court should * * * [make] a careful, individual examination of each of the jurors involved, out of the presence of the remaining jurors, as to the possible effect of the articles." [15]

Coppedge v. United States, 106 U.S.App. D.C. 275, 272 F.2d 504, 508 (1959). Recognizing that "we must spare no effort to secure an impartial panel,"

---

14. We find the following language in Judge Swygert's dissent pertinent: "Moreover, the judge did not make a searching inquiry of this juror with regard to whether he might have been prejudiced by the article. * * * Rather, he merely asked the juror whether the article might or could influence him. In my opinion, this was not a sufficient inquiry under the circumstances. It was not the province of the juror to make the ultimate determination whether the article might or could have prejudiced him. The judge, after further questioning, should have made that final decision himself. If the juror had been removed from the presence of the other jurors and questioned further by the judge, it might well have developed that the juror would have admitted his inability to disregard the statements in the news report."

15. And see Standards Relating to Fair Trial and Free Press, supra, n. 13, § 3.4:

"Selecting the jury.

* * * * *

(a) Method of examination.
Whenever there is believed to be a significant possibility that individual talesmen will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to his exposure shall take place outside the presence of other chosen and prospective jurors. * * *"

United States v. Dennis, 183 F.2d 201, 226 (2d Cir. 1950) aff'd 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), we conclude that the least required of the district court was to conduct a careful examination of each of the jurors. As to those jurors who offered no responses to the court's questions, we agree with the conclusion of the court in Henslee v. United States, 246 F.2d 190 (5th Cir. 1957), that the fact that they did not respond to the court's general inquiries does not establish that the publicity "could not have prejudiced any member of the jury." 246 F.2d at 193.

 Toward the end of the first day of the voir dire examination, after nine of the twenty-seven jurors examined had been excused because of preconceived opinions of appellant's guilt, Silverthorne's counsel requested permission of the court to examine the jurors individually. The court denied the request, pursuant to the discretion accorded it in such matters.[16] In so ruling, the court, under the peculiar and difficult facts of this case, abused its discretion to the prejudice of the appellant. At the time appellant's motion was directed to the court, the examination had been concluded as to four of the jurors who were ultimately selected, two of whom *were never questioned individually by the court.*[17] Had the trial judge's examination been more exhaustive, we would have less cause to attribute error to this ruling. Cf. Kreuter v. United States, 376 F.2d 654 (10th Cir. 1967); Rizzo v. United States, 304 F.2d 810 (8th Cir.), cert. denied, 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed.2d 123 (1963). However, in light of the fact that we find the court's examination ineffective to test the jurors' competency, we deem

the overruling of appellant's request to interrogate those jurors who had not committed themselves prejudicial error. Cf. Alverez v. United States, 282 F.2d 435 (9th Cir. 1960); Brundage v. United States, 365 F.2d 616 (10th Cir. 1966); Brown v. United States, 119 U.S.App. D.C. 203, 338 F.2d 543 (1964). The defendant in a criminal case has the right to "probe for the hidden prejudices of the jurors." Lurding v. United States, 179 F.2d 419, 421 (6th Cir. 1950). The impartiality necessary on behalf of a fair juror,

> "is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula."

Irvin v. Dowd, supra, 366 U.S. at 724– 725, 81 S.Ct. [1639] at 1643–1644. The tests and procedures adopted by the court below were too restrictive in both scope and substance to accord to appellant the right to explore for the impartially fair juror and the court should have permitted appellant's counsel to interrogate the prospective jurors.

### Publicity During The Trial

While appellant's pretrial publicity raised, for the most part, the *probability* of prejudice on the part of the jurors, the publicity which accrued during the course of the trial bore less of the indicia of probability; it approached prejudice per se. Relative to the publicity contemporary with the trial of the case, appellant made motions for (1) mistrial; (2) to interrogate the jurors as to the effect of the publicity on each of them;

---

16. Rule 24, Federal Rules of Criminal Procedure:

> "(a) Examination. The court may permit the defendant or his attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the defendant or his

attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper."

17. See footnote 9, supra, jurors Groner and Curley.

and (3) to prohibit the jurors from taking newspapers into the jury room. The motions were denied each time they were made.

Appellant's first motion for mistrial was made following an article in the San Francisco Examiner on January 19, 1966, two and one-half weeks after the trial had begun. The headline read, "DON'S TOP AID TAKES STAND—FAILS TO DELIVER", and characterized, in the article which followed, appellant's defense as having failed. The court did not consider the motion but offered to examine the jurors individually, in the courtroom or in chambers, as to whether they read and were influenced by the article. Appellant's counsel declined this offer of the court, apprehending that such an interrogation would call attention to the article and would do more to create prejudice than to dissipate it. Despite counsel's apprehension we think the court was required to take further action, and erred in not doing so.

When the defendant moves for a mistrial because of adverse publicity, he may, consistent with the preservation of the denial of that motion as error, decline an offer of the court to question the jurors relative thereto.

"It could very well be that questioning of the jury would be more prejudicial than helpful. * * * Under the circumstances there was a rebuttable presumption that the rights of the appellant were prejudiced. The district Judge should have taken such steps as were considered necessary by him to rebut that presumption, and if not convinced that the presumption had been rebutted, to have declared a mistrial."

Briggs v. United States, 221 F.2d 636, 639 (6th Cir. 1955); Krogmann v. United States, 225 F.2d 220 (6th Cir. 1955).[18]

While defense counsel was voicing the aforesaid motion to the court, the jurors were sitting in the jury room reading newspapers. One juror had a collection of "all the articles pertaining to the trial" which had appeared in the newspapers. When the bailiff brought these matters to the attention of the court, and the information passed on to appellant's counsel, the latter moved the court to prohibit the jurors from bringing the papers into the jury room. The court denied the motion, stating that he felt he could not "deprive a great many people from the pleasure of reading the morning paper." (R.T. 1846.) While no showing was made by appellant as to what articles, if any, were in the newspapers at that time which were prejudicial to him, we believe that an order prohibiting the reading of newspapers in the jury room would have been proper and indeed, necessary. Furthermore, although appellate courts are slow to impute to juries a disregard of their instructions, Fairmont Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 485, 53 S.Ct. 252, 77 L.Ed. 439 (1933), and the assumption that the jurors obeyed the court's directives to avoid all contact with the publicity concerning the case will be indulged in until a contrary showing has been made, Estes v. United States, 335 F.2d 609 (5th Cir. 1964), cert. denied, 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559 (1965); United States v. Agueci, 310 F.2d 817, 99 A.L.R.2d 478 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963), we have no recourse, in the light of this incident, but to lay the ordinary assumption aside and to attribute little if any weight to the court's repetitive admonitions that the jurors should read or hear nothing about the case.

On January 23, 1966, a full column article by a widely read columnist

---

18. Furthermore, the article here in question is one from which prejudice *might* arise. Once this article was brought to the attention of the court, the Government had the burden to establish that no juror had the matter brought to his attention. Calo v. United States, 338 F.2d 793, 795 (1st Cir. 1964). No such showing was made by the Government in this case.

appeared in the San Francisco Examiner, which read in part as follows:

> "* * * [Silverthorne] too, was a folksy type who pressed ample loans on friends without the old-fashioned and now discarded formality of security. Sometimes, or so the narrow-minded prosecution maintains, he absent-mindedly folded samples of the bank's capital away in his watch pocket before taking off for Las Vegas for the weekend. * * *"

The remainder of the article denounced the manner in which the bank conducted its affairs. Silverthorne's counsel made a motion for a mistrial and requested the court to interrogate the jurors regarding this article. Both motions were denied by the trial court. The denial of the motion to interrogate was error. Adjmi v. United States, 346 F.2d 654 (5th Cir. 1965), cert. denied, 382 U.S. 823, 86 S.Ct. 54, 15 L.Ed.2d 69 (1965); United States v. Accardo, 298 F.2d 133 (7th Cir 1962); Coppedge v. United States, 106 U.S.App.D.C. 275, 272 F.2d 504 (1959); Marson v. United States, 203 F.2d 904 (6th Cir. 1953). Cf. Marshall v. United States, 355 F.2d 999, 1005 (9th Cir. 1966).

■ On January 27, 1966, the San Francisco Chronicle [19] headlined: "HOW WIFE SPIED ON SILVERTHORNE", with the subheadline, "Private Eye Sues Her for Fees", followed by an article which read in part:

> "The social activities of banker Don C. Silverthorne and a co-subject were under investigation for three weeks last spring by a detective agency hired by his wife, it was revealed today. * * *"

There then followed the story of a municipal court suit which was filed by the detective agency for payment by Mrs.

Silverthorne of detective fees. There was no direct accusation of sexual misconduct on appellant Silverthorne's part, but the inference existed.[20] Appellant moved for a mistrial. The court, after condemning the article as in "very poor taste", "irresponsible journalism", and an "interference with the process of the law", denied the motion stating that the article

> "[D]oes bring up a question that can, of course, be covered by the testimony in the case without any reference to the article. * * *"

Directing his attention to appellant's counsel, the court went on to explain:

> "You certainly can have testimony as to his conduct in the past two or three months in this very same period, can't you?
>
> "And if he is a highly responsible, reputable, outstanding citizen, you certainly could bring several people here including Mayor Shelley as character witnesses."

In its ruling that appellant could rebut the article's implications by producing evidence of good character the district court contravened the principle that "the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." Turner v. State of Louisiana, 379 U.S. 466, 472–473, 85 S.Ct. 546, 550, 13 L.Ed.2d 424 (1965).

The trial court should not have denied the motion for a mistrial without having first ascertained, by questioning the jurors, that they had not read an article about the defendant in the San Francisco Chronicle of January 27, 1966, or, if any of them had read it, that they

---

19. Silverthorne's brief refers to this article as printed in the San Francisco Examiner and quotes language not appearing in the portion of the article made a part of the record. The portion of the article in the record is a continuation of an article which appeared on the front page of the newspaper. The first portion of the article does not, however, appear in the record. The government makes no point of this.

20. As the trial judge stated, "The certain implication was that he had some female companion with him, someplace where they were following him."

were not influenced thereby. Cf. Calo v. United States, supra; Adjmi v. United States, supra; United States v. Accardo, supra; Coppedge v. United States, supra.

For the same reasons the trial court erred in failing to interrogate the jurors on appellant's motion later on the same day, January 27, regarding a similar article which appeared in that day's San Francisco Examiner, headlined, "EVERYWHERE DON WENT—TWO DETECTIVES". Substantially the same facts were reiterated concerning appellant's alleged indiscreet activities.

Appellant's defense, the validity of which we do not here pass on, was that any and all monies of the bank which were diverted to his personal account, were obtained by him and used for the benefit of the bank. During the presentation of this defense, the San Francisco Examiner headlined, on January 28, 1966: "$700,000 FEES DON'S BANK DIDN'T GET", followed by a one-sided interpretation of Silverthorne's trial testimony, substantially ignoring defense theory and evidence. Appellant's motion for a mistrial and for interrogation of the jurors was overruled, the court stating, " * * * I think the jury can filter out from the testimony the truth and the falsity of the headline."

Jurors are not presumed to separate the truth from the falsity in newspaper articles concerning the trial in which they sit as judges of fact. The jury's impartiality must be kept free from "any outside influence, whether of private talk or public print." Patterson v. Colorado, supra, 205 U.S. at 462, 27 S.Ct. at 558, 51 L.Ed. 879. It is therefore the affirmative duty of the trial court to take positive action to ascertain the existence of improper influences on the jurors' deliberative qualifications and to take whatever steps are necessary to diminish or eradicate such improprieties. Coppedge v. United States, supra, 272 F.2d at 508.

We recognize difficult practical problems which were faced by the trial judge in this case. First, the usual difficulty of enforcing an order not to read newspapers, and second, that an instruction to a non-sequestered jury not to read newspapers, or the questioning of that same jury repeatedly on voir dire as to whether they have been reading publicity about the case on trial, might well incite their joint or individual curiosity and encourage attempts to read the very newspaper articles sought to be kept from their knowledge. At one point in the trial when the bailiff informed the judge that the jurors were reading newspapers in the jury room, and the court was again faced with the appellant's motion to interrogate the jurors, he made the following significant statement:

"I think I am empowered and permitted to examine these jurors after the verdict has been returned, interrogate them about the particular matters that we are talking about now, in some considerable detail.

"If the verdict is * * * [favorable] to the defendants, of course, these motions will become immaterial, and if it is not favorable to the defendants, I think I can examine these jurors and question them about the articles, ask them about whether they read them or not, and what effect it had on them.

"I think if I ask them now it wouldn't do anything but prejudice them, so I will deny the motions for mistrial made by and on behalf of the defendant Silverthorne, but I will consider, although I have not made the determination yet but will consider the question of interrogating the jurors if there is a verdict adverse to the defendants following the return of the verdict. I am not making a decision at this time, but I am considering it." [21]

The quandary faced by the trial judge was somewhat similar to that faced by the state trial judge in the Sheppard

---

21. Following the return of the jury's verdict the court made no interrogation of the jurors concerning the articles which had appeared in the newspapers.

murder trial.[22] There, Walter Winchel broadcast during the trial that one Carol Beasley claimed she was Sheppard's mistress and had borne him a child. The jurors were queried as to whether they heard the broadcast. Two jurors admitted they had heard the news story, but both stated that what they had heard would have no effect on their judgment in the case on trial. Accepting the jurors' assurances as satisfactorily disposing of the probability of prejudice to the defendant, the judge replied to defense counsel's motion for a mistrial thusly:

> "Well, how are you ever going to prevent those things, in any event I don't justify them at all. I think it is outrageous, but in a sense, it is outrageous even if there was no trial. * * * How would you ever, in any jury, avoid that kind of thing?"

Despite the inability of the trial judge to prevent newspapers or other news media from being brought to the attention of a non-sequestered jury alleging evidence of misconduct of the defendant not offered against him at the trial, the trial court cannot assume that all is well, or that there is nothing he can do. He is required to assume, until he has established otherwise by voir dire examination, "that some of this material reached the members of the jury." Sheppard v. Maxwell, supra, 384 U.S. at 357, 86 S.Ct. at 1519, citing Commonwealth v. Crehan, 345 Mass. 609, 188 N.E.2d 923 (1963).

We think that in view of the nature of some of the newspaper publicity unfavorable to the appellant, the trial court should have interrogated the jury, in camera, when requested to do so by defense counsel.

Without reaching the other points raised by appellant Silverthorne, we feel required to hold that he did not receive a fair trial; that the probability of prejudice arose and was not eliminated. Sheppard v. Maxwell, supra; Estes v.

State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965).

The judgment of conviction is reversed and the cause is remanded for a new trial. Because of our disposition of the Bennett appeal, there will be no problem of severance on remand. The lapse of time occasioned by this appeal will at least tend to diminish the necessity of further delay before picking a neutral jury, and, perhaps, somewhat diminish public interest in the case. This may or may not suggest that a sequestration of the jury would be necessary.

Reversed and remanded.

---

22. See Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 660 (1966).