Joseph Edward MORRIS, Appellant,

v.

COMMONWEALTH of
Kentucky, Appellee.

No. 86–SC–84–MR.

Supreme Court of Kentucky.

Feb. 9, 1989.

Rehearing Denied April 6, 1989.

Oleh Tustaniwsky, Linda K. West, Asst. Public Advocates, Frankfort, for appellant.

Frederic J. Cowan, Atty. Gen., Frankfort, David A. Sexton, Vickie L. Wise, Asst. Attys. Gen., for appellee.

GANT, Justice.

On the evening of October 18, 1984, appellant Joseph Edward Morris, Tony Mallory and Jackie Gilbert formulated a plan to burglarize the home of Mr. and Mrs. George Pope in Harlan County, the Popes being 102 and 95 years of age. At the Pope home, on this occasion, in addition to the mother and father, were the three sons of the Popes—Howard Pope, who had gone upstairs to retire for the night; and John and George, Jr., who were in the living room watching television. Appellant Morris and Mallory were armed, and Gilbert carried with him a roll of duct tape to be utilized to bind the victims.

About 9:15 p.m., the two armed burglars broke into the house and robbed John and George of $345 in cash. Forcing the victims to the floor, they exacted the information from them that there was a safe in a storage room off the living room. Gilbert then entered the house, and he and appellant began to tie up the victims with the tape while Mallory went to the storage room.

Meanwhile, Howard Pope apparently heard the noise created downstairs by this scenario and armed himself with a .30–.30 rifle. He proceeded downstairs where he encountered Mallory and exchanged gunfire with him. Then Howard Pope stepped into the living room, where he was shot and killed by the appellant.

Appellant was tried for and convicted of intentional murder, and given the death penalty upon recommendation of the jury.

■ At the outset of this trial, appellant moved that the voir dire of the jury panel be conducted individually, inasmuch as the appellant was indicted for the capital offense of intentional murder. According to the motion, its purpose was to discover the effect, if any, of pre-trial publicity and the opinion of the separate jurors on the death penalty. No effort was made in this motion to exclude the public or press, merely the other members of the panel. This motion was denied.

We have previously held that "separate examination of jurors or prospective jurors in circumstances of potential prejudice is a matter of procedural policy and is not a requirement of due process." *Ferguson v. Commonwealth*, Ky., 512 S.W.2d 501 (1974). However, in that case, in Footnote 1, p. 503, the court went on to "suggest to the trial court that they give thought to the use of separate examination of jurors in appropriate circumstances." Effective January 1, 1989, RCr 9.38 has been changed to add the requirement that, when the Commonwealth seeks the death penalty, individual voir dire will be conducted to discover the effect of pre-trial publicity and the feeling of the jurors concerning the death penalty.

It is the opinion of the court that, in the instant case, the circumstances were such that the motion should have been granted. The failure to grant, considered with numerous other events which occurred during the course of this trial, resulted in prejudicial error to the appellant.

The reason for the change in the rule and the reason for this ruling are the same. When there has been extensive pre-trial publicity, great care must be exercised on voir dire examination to ascertain just what information a prospective juror has accumulated. In the absence of individual voir dire, a disqualifying item of knowledge or a

rumor voiced by one panelist—even inadvertently—may well taint the entire panel. It is mandatory to permit voir dire questioning which will assure that a jury which is empaneled will base its verdict solely on the evidence in the case and the instructions of the court. *See United States v. Dellinger*, 472 F.2d 340 (7th Cir.1972); *Silverthorne v. United States*, 400 F.2d 627 (9th Cir.1968). In the instant case, the denial of the motion to separate made it impossible to ascertain what an individual juror had heard about the case.

■ Continuing with the voir dire, the appellant sought to determine whether each juror could consider the full range of penalties prescribed by statute relating to the offense of intentional murder, for which this appellant had been indicted. Four of the jurors, in response to questioning, indicated that, if the proof was that there was an "intentional" murder, they would consider *only* a death penalty. The fallacy of the failure to separate the jury appears again in this process. When counsel for the appellant questioned the first juror on his feeling about the penalty for intentional murder, the juror injected the phrase "cold-blooded." This phrase stayed in the voir dire and answers until the judge interceded after a protracted argument and denied the appellant the use of the word "intentional" in further voir dire. However, the court denied the motion to excuse these four jurors for cause, forcing the appellant to exhaust his peremptory strikes when there were other jurors he wished to strike. We do not consider the rehabilitative efforts of the Commonwealth sufficient, and feel that failure to strike these jurors for cause constituted reversible error. We note with interest that the court sustained motions of the Commonwealth to strike six jurors who answered that they could not give the death penalty under any circumstances, but would not strike these four who answered they could give nothing else.

The questioning during the voir dire was hardly a model for examination of prospective jurors. It was filled with hypotheticals propounded by both counsel for appellant and counsel for the Commonwealth, and some of the hypotheticals were just invented by the jurors.

There were bench conferences, objections to questions and constant bickering between the attorneys. It is the opinion of this court that the lower court should have informed the jury there are four penalties for the capital offense of intentional murder—viz., death, life without parole or probation for 25 years, life, or a term of not less than 20 years. KRS 532.030. The jury should be asked the simple question "If you determine under the instructions of the court beyond a reasonable doubt that the defendant is guilty of intentional murder, could you consider the entire range of penalties provided by statutes of this Commonwealth as outlined to you?" Both the Commonwealth and the defendant are entitled to a panel of jurors who will consider the entire range of punishment. Those who will not should be struck by the court for cause, whether on behalf of the Commonwealth or the defendant.

In the instant case, however, the court, instead of correcting the voir dire, merely forbad the use of the word "intentional" in questioning by appellant's counsel. This thwarted questioning relating to the sole crime with which he was charged, that of intentional murder.

■ There are other allegations of error which merit discussion. For example, appellant argues that the court should have directed a verdict of "not guilty" on the charge of intentional murder, contending there was overwhelming evidence of extreme emotional disturbance. The basis of this contention is his argument that he shot the victim who was armed for fear that he, himself, would be shot. Extreme emotional disturbance, if present, merely mitigates a charge of murder, but permits an instruction on voluntary manslaughter, and should be left to the jury.

■ Appellant complains about the introduction of 19 photographs of the deceased. Standing alone, this may or may not be reversible error. However, on retrial the court should utilize selected photographs which fairly present the evidence sought to

be introduced and not overwhelm the jury with repetitive photographs.

■ Another alleged error is the conduct of the Commonwealth Attorney during his opening statement, his questioning of witnesses, his closing arguments, and the penalty phase of the trial. These allegations of error are well taken, as seldom have we seen such flagrant disregard for the rules of evidence. It began with the opening statement with such comments as "There is no greater sacrifice that a man can make than that of laying his life down for his brothers"; "The life of a hero, a man who will lay down his life and so the greatest thing that's possible for the members of his family, who gave the ultimate sacrifice ..."

The questioning of the family of the victim was another example of excess. Questions were asked continually and permitted over objections to establish the war record, wounds, community service, etc. of all the Pope family. For a typical example, the direct examination of John Pope, one of the robbery victims, included the following:

Q. In addition to that injury, were you also injured in Korea?

A. Yes, sir.

Q. And what type injury did you receive there?

A. Schrapnel, in the hip.

\* \* \* \* \* \*

Q. Do you know what saved you?

A. Huh?

Q. What saved you?

A. It was a shooting.

Q. Who saved you?

A. My brother, Howard.

\* \* \* \* \* \*

Q. Did you love your brother?

A. I sure do.

Q. I'm sorry. I spoke in the past tense. You still love your brother, don't you?

A. I sure do.

Q. Did you expect on the 18th of October that his life would be taken away from him?

A. No, sir.

Q. And the manner in which it was taken?

A. Had no idea in the world.

Q. Did you expect on October 18, 1984, for three (3) grown men, young men, strong men, to come in on you, fifty-three (53) years of age, your brother fifty-five (55), and your other brother, I think has testified fifty-six (56) or fifty-eight (58) years of age, your mother ninety-six (96) and your father a hundred and one (101) years of age, did you expect that, sir?

A. Had no idea in the world.

\* \* \* \* \* \*

Q. How did you feel after you got up and saw your brother and in a few more minutes when you started talking to this officer?

A. I couldn't describe it.

In questioning the investigating officer in the case, the prosecutor established that one Pope brother was an ex–Commonwealth Attorney and that George Pope, Sr. had been County Attorney for many years.

This court has permitted some latitude in establishing the identity and general characteristics of the deceased when the evidence is given in a manner that is not "emotional, condemnatory, accusative or demanding vindication." *See McQueen v. Commonwealth*, Ky., 669 S.W.2d 519, 523 (1984). However, the entire tenor of the arguments and the questioning herein was to point out that the victim was a "hero," a "constructive man," in fact, a leader of the community. The Supreme Court of the United States spoke of this in *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 2534, 96 L.Ed.2d 440 (1987), when it said:

Nor is there any justification for permitting such a decision [whether to impose the death penalty] to turn on the perception that the victim was a sterling member of the community rather than someone of questionable character.

And in a footnote, the court added:

We are troubled by the implication that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are

perceived to be less worthy. Of course, our system of justice does not tolerate such distinction. *Cf. Furman v. Georgia*, 408 U.S. 238, 242, 92 S.Ct. 2726, 2728, 33 L.Ed.2d 346 (1972).

On remand, the prosecutor shall refrain from the type of eulogistic speeches and questions utilized in this trial.

We have carefully reviewed the other allegations of error made by the appellant, and find them without merit. We do not pass on the question of whether the death sentence herein is disproportionate, as we are remanding this case for a new trial.

The judgment of the Harlan Circuit Court is reversed, and this case is remanded for a new trial.

STEPHENS, C.J., and COMBS and LEIBSON, JJ., concur.

VANCE, J., concurs in result only.

STEPHENS, C.J., files a separate concurring opinion in which COMBS and LEIBSON, JJ., join.

WINTERSHEIMER, J., dissents and files a dissenting opinion.

LAMBERT, J., did not sit.

STEPHENS, Chief Justice, concurring.

I concur with the majority's enumeration of error, but as to the issue of prosecutorial misconduct, I would go further and admonish the prosecutor, on retrial, that certain additional conduct is unacceptable. First, the commonwealth's attorney shall not challenge the defendant's decision not to plead guilty, thus "forcing us through this process." Transcript of Evidence [hereinafter TE] VIII 1063. The Court disapproved of this practice in *Norton v. Commonwealth*, Ky., 471 S.W.2d 302, 306 (1971).

Next, the prosecutor should not denigrate defendant's counsel for being a public defender. Nor should he make a point of the public defender's office representing another defendant sentenced to death, on appeal. The commonwealth attorney should not mislead the jury by equating the intoxication defense with a license to kill, when it works only to negate intent as the state of mind required for the highest degree of homicide, murder. He should also refrain from misleading the jury during the penalty phase about the defendant's prospects for rehabilitation through counseling.

The prosecutor's closing argument during the penalty phase included a perverse comment on appellant's religious faith as a mitigating factor.

> If he's sincere about his faith then his life doesn't mean anything anymore. He's made his amends with his maker. You can't take that from him, and if he's sincere about it he'll be sincere when he's strapped in the chair....

TE XIII 1712. Using a defendant's religious faith as a reason to execute him is a contention which does not belong in a court of law in this Commonwealth. The commonwealth attorney should also avoid expressing his personal opinion that appellant deserved death. *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

The prosecutor questioned appellant at length about illegal drug transactions and his knowledge of drug lingo and prices, despite appellant's motion in limine to prohibit questions about drug trafficking, which was sustained by the trial court. Apparently, the commonwealth attorney must be reminded of the importance of complying with trial court rulings.

Finally, a defendant should not be criticized to the jury for not disclosing a witness list to the Commonwealth. He or she is entitled to withhold this information. *King v. Venters*, Ky., 596 S.W.2d 721 (1980).

Overall, the prosecutor's trial tactics in this case were akin to guerilla warfare, and in my opinion, have no place in assuring this or any other defendant a fair trial. The United States Supreme Court has recognized that egregious prosecutional misconduct can amount to a denial of a defendant's constitutional right of due process of law. *Greer v. Miller*, 483 U.S. 756, 107 S.Ct. 3102, 3109, 97 L.Ed.2d 618 (1987), *Donnelly v. DeChristoforo*, 416 U.S. 637,

643, 648–49, 94 S.Ct. 1868, 1871, 1873, 40 L.Ed.2d 431 (1974). The commonwealth attorney's conduct fell far short of that which comports with the fundamental fairness requirement of due process.

Therefore, I would reverse appellant's conviction on the above-mentioned additional grounds.

COMBS, and LEIBSON, JJ., join in this concurring opinion.

WINTERSHEIMER, Justice, dissenting.

I respectfully dissent. I do not believe the defendant has proved that the trial judge abused his discretion in determining that the evidence was insufficient to require individual voir dire examination of the jury. Although it may be true that this was not a model trial or a textbook example of how to examine prospective jurors, I do not believe there was any fundamentally unfair prejudice to the defendant. It is the purpose of this Court to review error and not to retry cases. The question we must consider is whether the allegations of error are reversible.

The prosecution did not improperly solicit sympathy for the victim or his family. The defendant complains that the murder victim was referred to as a hero and the prosecution described the victim as "a man who came downstairs to defend his family and do what any decent human being would do...." The victim's mother and father were 95 and 102 years old respectively, and the mother was an invalid. Their home had been broken into by two armed burglars, and the murder victim came downstairs armed with a rifle and was killed in an exchange of gunfire. It is difficult to understand why the statements by the prosecutor in commenting on this evidence amounts to reversible error. The comments and conduct of any prosecutor must be viewed in the context of the total trial and what effect it has on the fairness of that trial. *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Here the evidence of the defendant's guilt was overwhelming. There was no prosecutorial misconduct which required reversal.

Morris received a fundamentally fair trial. There is no perfect proceeding, but all that is required is fairness. *Michigan v. Tucker* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). *McDonald v. Commonwealth*, Ky., 554 S.W.2d 84 (1977).