STUMBO, Justice.
Robert Foley was sentenced to death for each of four murders by the Madison Circuit Court. This is his matter of right appeal. Having reviewed the record and briefs and heard oral arguments, we afñrm.

THE FACTS:

Foley was indicted in December of 1991 for the murders of Lillian Contino, Kim Bow-ersock, Jerry McMillan, and Calvin Reynolds. The murders took place and the indictment was issued in Laurel County. A change of venue was granted and the trial was held in Madison County in April of 1994. During the intervening years, Foley was indicted for and convicted of two other murders in a single trial which took place in Laurel County. That conviction was upheld by this Court in Foley v. Commonwealth, Ky., 942 S.W.2d 876 (Ky.1996).
On October 8, 1989, the four victims were at a cabin owned by David Gross and occupied by Phoebe Watts, who lived there with her two children. On October 8, Watts returned home after work at approximately 11:30 p.m. David Gross, Calvin Reynolds, Kim Bowersoek, Lillian Contino, Jerry McMillan and Watts’ children were at the cabin. While beer was being drunk, Watts did not recall any drunkenness or marijuana use.
Soon afterward, Gordon Canter and Appellant came into the cabin. Reynolds was sitting in an easy chair in the center of the room, with Bowersoek seated beside him on the floor. Gross was on the edge of a bed next to Watts and her children. McMillan and Contino were sitting on a couch. All were in the same room. Appellant went to Bowersoek and grabbed her by the hair. When Reynolds arose to come to her aid, Appellant pulled his gun and began shooting, killing the four victims. When Foley turned to Gross, Gross stated, “Not me, man,” and waved his hands. Watts testified that the children were not awakened by the gunfire and that she took them into a bedroom after the shooting ended.
When she returned to the living room some time later, Appellant, Canter, and Gross were in the kitchen drinking beer. Appellant brought Watts a beer and asked “Can you handle this?” Watts was permitted to testify over defense objection that she interpreted that question to mean she would be killed. Watts assisted in the clean-up of the cabin. Watts testified that none of the victims had a weapon or in any way threatened Appellant.
The following night, Appellant, Gross, and Canter disposed of the bodies by burying them in a cistern or septic tank and covering them with lime and cement. The burial site was near the Gross cabin on land which was titled at various times to members of both the Gross family and Foley family. The bodies were discovered two years later by police following up a tip. When the bodies were found, the property was titled to Appellant’s father, a fact that plays a role in some of the issues presented by Foley on appeal.
The Commonwealth’s theory of these murders was that Appellant was angry with Bow-ersock because he believed she had accused him of growing and selling marijuana. This allegation had supposedly caused Appellant trouble with his parole officer, though the officer testified otherwise at trial. The other victims were apparently killed because they witnessed Bowersock’s murder.
Watts and Canter were among the witnesses against Appellant at trial. David Gross died in October of 1990, the victim of a murder still unsolved at the time of this trial.

STANDARD OF REVIEW:

KRS 532.075(2) provides that, in death penalty cases, “[t]he Supreme Court shall consider the punishment as well as any errors enumerated by way of appeal.” This has been held to mean that there is an exception to the contemporaneous objection rule in eases where the death penalty has been imposed. See, e.g., Ice v. Commonwealth, Ky., 667 S.W.2d 671, cert. denied, 469 U.S. 860, 105 S.Ct. 192, 83 L.Ed.2d 125 (1984). As we stated in Sanders v. Common *929 wealth, Ky., 801 S.W.2d 665, 668 (1990), cert. denied, 502 U.S. 831, 112 S.Ct. 107, 116 L.Ed.2d 76 (1991):
Assuming that the ... error occurred, we begin by inquiring: (1) whether there is a reasonable justification or explanation for defense counsel’s failure to object, e.g., whether the failure might have been a legitimate trial tactic; and (2) if there is no reasonable explanation, whether the un-preserved error was prejudicial, i.e., whether the circumstances in totality are persuasive that, minus the error, the defendant may not have been found guilty of a capital crime, or the death penalty may not have been imposed.
Foley’s brief poses thirty-four (34) issues for resolution by this Court, many of which are not preserved. This opinion will not attempt to address in detail every issue, though each has been carefully considered on its merits.

I. WAS THE VOIR DIRE IMPROPERLY RESTRICTED?

Appellant first argues that he was denied due process by the trial court’s conduct of the examination of the prospective jurors and refusal to propound a question submitted by the defense. Specifically, the defense sought voir dire on whether each juror could vote for each of the possible penalties for intentional murder, including the minimum penalty of twenty (20) years in the penitentiary, in a ease where a jury had found a defendant guilty of more than one intentional murder.
Prior to trial, the judge advised counsel that he would question the jury about the death penalty himself, but would allow the attorneys to question the jurors about pretrial publicity. The questions at issue were propounded to each juror and were substantially as follows:
Our legislature in Kentucky has recognized every case is different and in recognizing that, they’ve determined there are four different types of penalties that can be imposed in a murder, case. One would be for a term of years in prison of not less than 20 years; or two would be for a term of life in prison; three would be for a term of life in prison without possibility of parole for at least 25 years; and the fourth would be the death penalty. The jury would not even be considering the death penalty unless the jury determined that not only was there an intentional murder, but there was [sic] some aggravating circumstances in the case. In addition to the aggravating circumstances, the jury would be considering mitigating circumstances or anything that it felt dealt with the issue of punishment. Bearing that in mind, if you were chosen as a juror in a case of that nature, would you be able to give a fair and equal consideration of all four of those different penalty options?
Upon receiving an affirmative response to this question, the court would then ask: “Would you be able then to impose whichever one you felt was fair and appropriate under the facts as you heard them in that particular case?”
Depending on the jurors’ responses, some were also asked if there was a penalty that the juror could not fairly consider and whether that juror could consider a penalty of twenty years as well as the death penalty. The defense sought to ask each juror specifically whether he or she could consider imposition of each specific sentence in a ease of multiple murders. The trial judge denied the defense request on the ground that the more specific question would compel the prospective jurors to prejudge this ease. The judge also refused to define or explain for the jurors what aggravating and mitigating circumstances were.
It is Appellant’s contention that merely asking whether a juror can consider the entire range of punishments and do what is right is insufficient to advise counsel whether a juror would actually vote for any particular penalty. Thus, Appellant argues, he could not make meaningful and valid challenges for cause or intelligent use of his peremptory strikes.
In particular, Appellant argues that he was unable to determine whether any prospective juror was biased in favor of the death penalty to the extent that he or she would not, no matter what the circumstances might have been, consider imposing a lesser *930 penalty. Such bias would serve as grounds for a challenge for cause. Grooms v. Commonwealth, Ky., 756 S.W.2d 131, 137-38 (1988). RCr 9.38 grants to the circuit court the authority to conduct the examination of the prospective jurors. If the court chooses to personally conduct the examination, it “shall permit the attorney for the Commonwealth and the defendant or the defendant’s attorney to supplement the examination by such further inquiry as it deems proper.” The further examination may be conducted by either counsel or the court. RCr 9.38. This rule was complied with in its entirety.
The trial court’s voir dire was clearly sufficient and explicit enough to elicit the information sought by Appellant’s counsel. The specific potential punishments that he sought to question the jurors about were disclosed and the jurors were asked if fair and equal consideration could be given to each, with no emphasis on a particular penalty. The question propounded to the jurors is in accord with and seems to simply be a more detailed version of that approved by this Court in Morris v. Commonwealth, Ky., 766 S.W.2d 58 (1989). Therein, this Court directed that: “The jury should be asked the simple question ‘If you determine under the instructions of the court beyond a reasonable doubt that the defendant is guilty of intentional murder, could you consider the entire range of penalties provided by statutes of this Commonwealth as outlined to you?’ ” Id. at 60. The trial court did not err in the conduct of the voir dire in this case and we find no ground for reversal.
II. WHETHER THE JURY SELECTION WAS CONSTITUTIONALLY VALID?
Appellant raises two types of jury selection challenges, one as to prospective jurors he contends either should or should not have been excused for cause and the other as to jurors who actually served but, in Appellant’s view, should not have.
A. Prospective Jurors:
Appellant alleges as reversible error the trial court’s failure to strike for cause certain prospective jurors he believes were not qualified to sit. Because the jurors were not stricken for cause, Appellant was forced to use peremptory challenges to remove them from the jury panel. In his opinion, this was a denial of his right to due process and to the free exercise of his peremptory challenges. Marsch v. Commonwealth, Ky., 743 S.W.2d 830, 831 (1987).
Juror A,[1] when asked whether he could consider the full range of penalties, responded with, “Are you asking me what I would do?” When asked again, he said he would do “the right thing.” When asked a third time, he said, “Yeah.” Appellant contends that these responses indicate hostility to the consideration of the full range of penalties. Additionally, prospective juror A had spoken to a friend of a friend who had driven near the location where the bodies were found. As to prospective juror B, Appellant contends that her response that she was “not sure” if she could put aside pretrial publicity in consideration of the eases is sufficient to require the grant of a challenge for cause.
Prospective juror C is said to be unqualified to sit because she stated that she would “do her best” to consider the full range of penalties but would not know whether that would be possible until she had heard all of the evidence and had to make a decision. Additionally, prospective juror C had testified during the Todd Ice murder trial. Ice, supra. Prospective juror D, who had seen on television an account of the charges against Appellant and could remember another recitation of the charges from “a year or two” ago, is alleged to be unqualified because he is unable to put aside pretrial publicity. Finally, prospective juror E stated that she did not “know what her mind’s gonna do” when asked if she could set aside pretrial publicity.
The Commonwealth’s response to the arguments of Appellant boils down to an *931 assertion that Appellant has carefully quoted out of context the statements of the prospective jurors in an effort to east the worst possible light on their responses to the voir dire. When considered in the context of all of the responses each made during questioning, the statements cited by Appellant lose their prejudicial connotations and, for the most part, become rather innocuous. Whether a juror should be excused for cause is a matter within the sound discretion of the trial court. Bowling v. Commonwealth, Ky., 873 S.W.2d 175, 177, cert. denied, 513 U.S. 862, 115 S.Ct. 176, 130 L.Ed.2d 112 (1994); Thompson v. Commonwealth, Ky., 862 S.W.2d 871, 874 (1993). The trial court’s decision will not be disturbed absent a clear abuse of discretion. Scruggs v. Commonwealth, Ky., 566 S.W.2d 405, 408, cert. denied, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978). While some of the answers given may have indicated some ambiguity as to the prospective jurors’ ability to consider the full range of penalties or to disregard pretrial publicity, the follow-up questioning by the court and counsel clarified any misunderstanding without falling into the forbidden arena of using “magic” questions to rehabilitate. Montgomery v. Commonwealth, Ky., 819 S.W.2d 713, 717-18 (1991). The trial court did not err in its refusal to strike these jurors for cause.
Appellant also challenges the granting of two motions by the Commonwealth to strike potential jurors for cause. Potential juror F responded to the trial court’s initial question in regard to the imposition of penalties by stating that she was against the death penalty. She later stated that she could consider the death penalty under certain circumstances, when the penalty seemed appropriate after hearing all of the evidence. The Commonwealth moved to strike her for cause stating that her answers indicated an equivocal ability to consider and vote for the death penalty in some situations. The defense did not object to the motion and it was granted by the court. During group voir dire, the Commonwealth asked if any juror would be unable to sit because he or she could not render a verdict because to do so would be passing judgment on another person. Prospective juror G answered that he hoped he would not have to pass judgment and that he did not feel he could render a verdict. Prospective juror G was excused over the objection of the defense, without further questioning.
The Commonwealth correctly cites Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), as dispositive of the striking of prospective juror F. In the former case, the United States Supreme Court said that a juror may be excluded for cause if his views on capital punishment would prevent or impair the performance of his duties as a juror in accordance with his instructions and his oath. Wainwright, 469 U.S. at 424, 105 S.Ct. at 852, 83 L.Ed.2d at 851-52. “ ‘[Djeterminations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.’ The trial court, ‘aided as it undoubtedly was by its assessment of [the potential juror’s] demeanor,’ was under the obligation to determine whether [the juror’s] views would ‘prevent or substantially impair the performance of his duties as a juror.’ ” Darden, 477 U.S. at 178, 106 S.Ct. at 2470, 91 L.Ed.2d at 155 (citations omitted); see also Stanford v. Commonwealth, 734 S.W.2d 781, 786 (1987), aff'd, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). The trial court did not abuse its discretion by excusing prospective juror F.
The Commonwealth emphasizes that there was more to juror G’s reluctance to sit in judgment than set forth by Appellant. The juror’s response to the voir dire question was that, “I’m a very religious person and I don’t believe—it goes against my belief to judge anyone. I’m not sure I could make a decision.” He also listed that same information on his juror qualification form. It is apparent to this Court that prospective juror G had views that were completely incompatible with serving on a jury and fulfilling the duties required of that service. Stanford, supra. The trial court did not err.

B. Jurors Who Should Have Been Stricken:

We next address the jurors that Appellant contends should have been stricken for cause *932 who actually sat on the jury and rendered a verdict against Appellant. Juror H recalled seeing a television story about the ease when the bodies were found. She recalled pictures of water tanks and fields and remembered that the victims were found in the tanks. Juror I responded to the questions about whether she could consider all of the penalties with, “I believe I can.” Trial counsel declined to question her further, and moved to strike her for cause. Juror J stated that his vision was impaired due to injuries received in an accident and stated that should he need assistance in seeing something, he would notify the court. Counsel moved that he be excluded from service due to disability.
Juror K had seen television accounts of the case, including one where Appellant was shown in handcuffs and another that mentioned drug involvement. She also recalled publicity about a common grave. She stated that she could consider the full range of penalties “depending on the evidence” and that she would presume innocence “unless proven guilty.”
The Commonwealth responds that, once again, Appellant fails to consider the voir dire as a whole. In addition to the statements recited above, Juror H stated that she remembered very little of the story she had seen on television, thought there were only two bodies, and that she could give Appellant a complete presumption of innocence. As to Juror I, the Commonwealth points out that Appellant asked no follow-up questions to clear up what he considered to be an answer that was “a little bit equivocal.” The trial court considered the answer to be expressed in a manner that he interpreted to mean, “I can [consider the entire range of penalties].” The Commonwealth also states that while Juror J admitted to problems with his vision, he also stated that he was a self-employed bulldozer operator. The Commonwealth believes heavy equipment operation indicates that Juror J has sufficient vision to serve on a jury. Finally, as to Juror K, the Commonwealth set forth most of her responses to voir dire questioning. Therein, Juror K stated that she could presume Appellant’s innocence, knew that handcuffs were routine, knew that the news media could and did make mistakes, and that she had formed no opinion as to Appellant’s guilt or innocence in this case. In overruling Appellant’s motion to strike for cause, the court stated that he believed the juror had gone overboard to give any information to the court that she might have had about the case, that she had formed no opinion and that she had strong feelings about the unreliability of news reports.
As previously stated, the trial court has discretion in determining whether to excuse a juror for cause and that decision will not be reversed on appeal unless its action is clearly erroneous. Further, prospective jurors do not live in a vacuum and cannot be expected to be totally ignorant of any case they may be called upon to decide. Jones v. Commonwealth, Ky.App., 737 S.W.2d 466, 467 (1987). The fact that a prospective juror may have some knowledge of a case does not establish objective bias. Peters v. Commonwealth, Ky., 505 S.W.2d 764, 765 (1974); See also Mu’Min v. Virginia, 500 U.S. 415, 431-32, 111 S.Ct. 1899, 1908, 114 L.Ed.2d 493, 509-10 (1991).
None of these four jurors had sufficient knowledge of this case to require disqualification or the granting of a motion for cause. Nor was there sufficient evidence that any of them would not be able to consider the entire range of potential penalties. Grooms, supra. There was no evidence that Juror J’s vision impairment was of such a magnitude that he was unable to fulfill his responsibilities as a juror. See KRS 29A.080. The trial court’s denial of Appellant’s motion to strike these four jurors for cause was properly denied.
III. DID THE TRIAL COURT ERR IN FAILING TO SUPPRESS THE RESULTS OF THE SEARCH THAT PRODUCED THE BODIES OF THE VICTIMS?
As previously noted, the bodies of Appellant’s victims were buried near the cabin, owned by David Gross, in which the shootings took place. Originally owned by Murph Gross, the property had been divided into two tracts, split by a gravel road which served as a driveway to the Gross cabin. *933 The deceased Murph Gross was related in some way to both Appellant and David Gross. David Gross owned the portion on which he lived. The other portion contained the burial site. In June of 1990, eight months after the murders and prior to the discovery of the bodies, the property was transferred by the Gross estate to John Foley, Appellant’s father. That deed was recorded. Sometime in 1990, the property was allegedly transferred by John Foley to Appellant, via unrecorded deed. Thus, at the time of the search which resulted in the discovery of the bodies (October 23, 1991), the recorded deed indicated that the property was owned by John Foley, though there allegedly existed an unrecorded deed reflecting Appellant’s ownership. Appellant and his father testified that the deed was unrecorded to protect the property from legal attachment as a result of unrelated civil litigation against Appellant. Appellant also testified that the unrecorded deed that demonstrated his ownership had been destroyed in a house fire. At no time during the relevant periods, that is the time of the murders or various searches of the property, could Appellant’s alleged ownership be ascertained through a record search alone.
The facts surrounding the discovery of the bodies are that Lonnie Owens, a Laurel County Deputy Sheriff, heard that four people had been killed at the Gross residence. He obtained a search warrant for the Gross property and conducted the initial, fruitless search in late August of 1991. Shortly after that search, Phoebe Watts, who was still living in Gross’s cabin, executed a eonsent-to-search form permitting a week-long search during which a pond was drained. Owens testified that Watts told him he could search all he wanted, because there were no bodies on the property. Again, nothing was found. At a later time, the deputy learned that somewhere on the property there was a water cistern. Still later, Deputy Owens was informed by a Kentucky State Police Detective that Kim Bowersock’s family believed the bodies were in a well on the subject property. This conversation occurred around October 21 or 22 of 1991.
Recalling the reference to a cistern, Owens again went to the property, this time without either a warrant or renewed consent. Once there, he noticed a depression on the side of the property owned by Foley, located anywhere from fifty to one hundred yards from the Gross cabin. Suspecting that this was the cistern he had heard about, he dug down about two-and-one-half feet and found the remains of a human foot. At that point, he ceased his search, called the sheriff, and sought and obtained a search warrant.
At the suppression hearing, the deputy testified that the location of the bodies was within sight of the Gross cabin; that he believed the property was owned by the Murph Gross family, though he did not attempt to determine the actual owner; and that the only name of record related to the wrecked cars near the location was Maggie Foley, Appellant’s wife, a fact he did not ascertain until after the bodies were found. He further testified that the cars and remains of the home on the property appeared to be abandoned, that there were no fences or other boundary markings, and that he saw no “no trespassing” signs.
Appellant contends that the initial search of his property without a warrant violated his subjective and reasonable expectation of privacy and was a violation of his Fourth Amendment rights. He contends that, though the property was not in his name at the time of the search, he had a substantial and reasonable interest in the property in that he testified that he had paid for it; had paid to have the deed to his father recorded; his father gave him access to the property as though it was his own; he used it as a storage site for his boat, wife’s car, ear parts, and other ears; and there was a “no trespassing” sign posted.
Since “arcane distinctions” of property law do not control a Fourth Amendment inquiry, Foley contends Owens took insufficient steps to determine ownership of the property before the search. United States v. Salvucci, 448 U.S. 83, 91, 100 S.Ct. 2547, 2552, 65 L.Ed.2d 619, 628 (1980) (citing Rakas v. Illinois, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387, 400-01 (1978)). Further, Appellant argues that even if an outdoor search *934 of the property were permissible, the bodies were found underground, in a location that required digging to uncover, not in an open field. He contends that he had a reasonable expectation of privacy in the cistern as it was closed, opaque, and concealed from the public view. Appellant also argues that the trial court erred in its finding that there was no “no trespassing” sign posted on the property.
The Commonwealth’s response has several facets: first, it argues that Appellant had no standing to contest the search because the property did not belong to him; second, it is argued that Owens believed the property was under the control of Phoebe Watts, since it was close to the Gross cabin in which she lived, and that Phoebe Watts had given him permission to search all he wanted to, albeit two months earlier; third, the property appeared to be abandoned, in that there were only the remains of a burned house, car parts, and three junk ears, none of which were titled to Robert Foley; and, finally, there were no boundary markers or fences and Owens saw no “no trespassing” signs.
After hearing the testimony of Appellant, his father, and Deputy Owens, the court denied the suppression motion. The court held as an initial matter that, because of conflicts in the testimony as to why title was held by John Foley rather than Appellant and the lack of corroborative evidence (such as the testimony of the administrator of the Murph Gross estate from whom the property was purchased) to prove Appellant’s title in the property, John Foley owned the property and, therefore, Appellant had no standing to contest the search. The court further held that even if Appellant had been the title holder, he had no expectation of privacy in the land because of its rural location, lack of no trespassing signs or other boundaries, and its abandoned appearance. Additionally, the court held that Owens had acted reasonably in conducting the search given the abandoned appearance of the property, and the on-and-off nature of the searches conducted of the area. The trial court also noted that John Foley had at the very least a proprietary interest in the property and had at no time objected to the search.
While the question of whether a reasonable expectation of privacy can exist in regard to the contents of a cistern located on property not held in one’s name is an interesting one, with many subtle sub-issues, we need not and will not reach it in this opinion. The trial court’s finding that Appellant had no standing to contest the search is where this inquiry both begins and ends. To establish standing to attack a search, one must establish a legitimate expectation of privacy in the searched property. Rawlings v. Kentucky, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633, 641 (1980); Sussman v. Commonwealth, Ky., 610 S.W.2d 608, 611 (1980). The factual findings of the trial court in regard to the suppression motion are conclusive if supported by substantial evidence. RCr 9.78.
The trial court very specifically, and in great detail, went through the testimony that was presented during the suppression hearing and carefully delineated why it made the finding that the property was owned by John Foley and, of more significance here, why Appellant had no ownership or other possessory interest that would permit him to challenge the search. Our own review of the evidence convinces us that there was substantial evidence to support the findings made by the trial court and that the trial court correctly found that Appellant had no reasonable expectation of privacy in the property owned by his father at the time the property was searched.
As did the trial court, even were we to find otherwise on the issue of ownership of the property, we cannot find that a cistern located on property without a dwelling of any type to be an appurtenance to the home and, therefore, part of “the intimate activity associated with the ‘sanctity of a [person’s] home and the privacies of life,’ ” as contended by Appellant. United States v. Dunn, 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326, 334 (1987). This was rural, open property that appeared to be abandoned and unoccupied and which the officer conducting the search believed belonged to the estate of a man with no immediately discernable connection to Appellant. The trial court did not err in denying the motion to suppress.

*935
IV. WHETHER ALLEGED EVIDENTIA-RY ERRORS ASSERTED DURING THE GUILT PHASE WARRANT REVERSAL?

Appellant asserts three evidentiary errors merit reversal of his convictions. He first contends that it was error to admit into evidence two photographs of the victims’ bodies taken after their discovery because the photos lacked relevance and were more prejudicial than probative in value. The Commonwealth responds that the photos were relevant to demonstrate the location at which the bodies were found and to illustrate the measures taken to conceal their whereabouts.
The general rule that photos, otherwise admissible, do not become inadmissible simply because they are gruesome and the crime is heinous “loses considerable force when the condition of the body has been materially altered by ... decomposition or other extraneous causes, not related to commission of the crime, so that the pictures tend to arouse passion and appall the viewer.” Clark v. Commonwealth, Ky., 833 S.W.2d 793, 794 (1992). The determination of admissibility begins by considering whether the photos are relevant. Relevant evidence is defined as “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” KRE 401. While it is true that Foley stipulated that the victims died of gunshots, we believe that the photos were indeed relevant to demonstrate the location of the bodies and the measures taken to conceal them, both factors that were consistent with the testimony of prosecution witnesses and thus corroborative of their testimony. Thus, the photos have relevance as they tend to support the testimony of an eyewitness to the crime.
Having found them relevant, we have reviewed the two photographs and do not consider them to be unduly gruesome; in fact, it is somewhat difficult to discern the particulars of the bodies depicted due to the quilts wrapped around them and the concrete, lime, and dirt covering them. In effect, these are basic crime scene pictures that do not show blood, decomposition or other gory or gruesome features. Further, the photos were shown only briefly, and were not emphasized in any way, unlike those at issue in Clark, supra. There was no reversible error in admitting the photographs.
The second evidentiary argument concerns the court’s ruling that certain testimony from two witnesses which could have cast doubt on the veracity of Phoebe Watts, one of the prosecution’s more important witnesses, was inadmissible. The first prohibited testimony would have come from Ed Gross, yet another relative of Murph Gross. Gross would have testified that he saw Watts in October of 1991, around the time of the discovery of the bodies, and that Watts told him she was leaving Kentucky because she did not want to “get stuck with what David and Gordon done.” The Commonwealth objected to the introduction of this testimony on dual grounds: that it was hearsay and that the defense had previously released Watts as a witness without asking her about this exchange with Gross. The defense argued that because Watts had testified that she left Kentucky out of fear of Appellant, the statement made to Gross was an inconsistent prior statement. Initially, the court overruled the Commonwealth’s objection, but upon questioning at sidebar and determining the exact nature of the proposed testimony, sustained it.
In a similar vein, the trial court refused to allow Louise Bridges to testify that Phoebe Watts had spoken with Bridges following Appellant’s prior murder trial and had asked Bridges whether she would be testifying in the next trial. Watts purportedly stated that she, Watts, would think of something for Bridges to say at the next trial. Appellant contends that this testimony is admissible and relevant to demonstrate Watts’ bias in favor of self-protection and motivation to lie. Again, the Commonwealth objected to the introduction of the testimony because it constituted hearsay and because the defense had already released Watts as a witness without having confronted her with the alleged statements.
KRE 613(a) provides as follows:
*936 Before other evidence can be offered of the witness having made at another time a different statement, he must be inquired of concerning it, with the circumstances of time, place, and persons present, as correctly as the examining party can present them....
Clearly, the foundation required by KRE 613 for the admission of a prior inconsistent statement of a witness was not laid by Appellant as to the testimony of Gross. While Watts testified that she left Kentucky out of fear of Appellant, Gross’s testimony puts a different motivation behind her act. Watts was released as a witness by the defense without having been confronted with that statement and allowed the opportunity to explain it. There was no error in the trial court’s refusal to admit the testimony of Gross under these circumstances.
The testimony of Bridges merits similar treatment, though Appellant does not contend that Bridges’ recitation of Watts’ alleged words is in any way contradictory to Watts’ actual testimony. Not having been given the opportunity to deny the testimony of Bridges, it cannot be said that her testimony is an inconsistent prior statement by Watts that would be admissible as an exception to the rules of hearsay. Again, no foundation was laid as required by KRE 613 and there was no error.

V. DID THE TRIAL COURT ERR IN DENYING APPELLANT A CONTINUANCE?

Appellant was indicted on December 20, 1991, and the trial was set for April 5, 1994. The trial date had been established by order entered on April 6, 1993, by the Laurel Circuit Court. Venue was changed on October 6, 1993, to the Madison Circuit Court. In February of 1994, Appellant sought a ninety-day continuance to allow additional time to prepare the case for trial. The grounds set forth in the motion were that the brief in Appellant’s earlier death penalty case was due on the same day that the trial was scheduled, that an associate of trial counsel’s had left his office abruptly and, generally, that he needed more time to adequately prepare. Defense counsel also stated that he had a trial in federal court set for the end of the month of February.
In rejecting the motion the trial court noted the following factors: That Appellant would not be prejudiced by the requested continuance; that the ninety days sought was not unduly lengthy; the delay sought was not caused by Appellant; that individual voir dire lengthens the trial; that there were two judges in the circuit; that the trial judge had cleared the month of April when assigned the case; that death penalty cases are complicated and emotionally and physically exhausting, especially when the same defendant and counsel had previously had a prior death verdict rendered against them. After noting that there is leeway to be given when the unexpected arises in the preparation of a capital case, the trial court denied the motion and offered to submit an affidavit in support of a motion for extension of time in which to file the brief due in the appellate court.
Appellant argues on appeal that this denial of a continuance violated his right to both federal and state due process standards by failing to provide him with the opportunity for complete evaluation, preparation, and presentation of a defense. Hunter v. Commonwealth, Ky., 869 S.W.2d 719, 722-24 (1994); see also Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). He contends that, as argued at the time of the motion, his preparation of the defense was impaired, specifically as to the mitigation evidence, or more precisely, the complete lack of mitigation evidence. Appellant states that possible theories of mitigation were clearly manifest, thus, there was a substantial risk of skewing of the fact-finding process.
Snodgrass v. Commonwealth, Ky., 814 S.W.2d 579 (1991), sets forth the seven factors to be considered by the trial court in ruling upon a motion for continuance: (1) length of delay sought; (2) whether there have been previous continuances; (3) the inconvenience to the litigants, witnesses, counsel, and the court; (4) whether the delay is purposeful or caused by the accused; (5) the availability of competent counsel, if at issue; (6) the complexity of the case; and (7) whether denying the continuance would lead to any *937 identifiable prejudice. Id. at 581. As noted above, the trial court analyzed each factor. In a close case, wé hold that the trial court did not err in denying this continuance. Factors 1, 2, 4, 5 and 6 all weigh in favor of Appellant. However, there is clear evidence that the granting of a continuance would have caused inconvenience to the court and further, and most importantly, there is absolutely no evidence of identifiable prejudice to Appellant arising from the denial of the continuance. Even at this distance from the trial, Appellant is able to set forth nothing specific that would have been presented, or even an avenue that could have been pursued, that would have constituted mitigating evidence admissible at trial. Having had in excess of two years to prepare for this trial, there can be no viable argument that Appellant did not have time to investigate and prepare for trial. This case is easily distinguished from the situation set forth in Hunter, supra, wherein the defense was given only six months to prepare for a capital murder ease. The trial court did not err in denying the continuance.

VI. DID THE TRIAL COURT ERR IN THE ADMISSION OF EVIDENCE OF THE VICTIMS’ BACKGROUNDS?

Appellant presents as error the introduction of evidence solely designed to elicit sympathy for the victims. The evidence consisted of the testimony of a close relative of each victim who set forth the birthday, marital status, employment, and number of children, if any, of each victim, as well as when the relative last saw the victim. Each relative testified for about five minutes. It is Appellant’s contention that this evidence, coupled with the prosecution’s repeated references to the victims and the use of the photographs discussed earlier in this opinion, denied him a fair trial.
We begin by noting that this error was in no way preserved, a fact admitted by appellate counsel. Even were the evidence objected to, the amount of testimony introduced does not begin to approach the prejudicial levels required to make this a reversible error. We have repeatedly held that “a certain amount of background evidence regarding the victim is relevant to understanding the nature of the crime. This Court has previously held that it was not error in the guilt phase when the testimony of the [relative] merely called the attention of the jury to the fact that the victim was once a living person rather than a statistic.” Bussell v. Commonwealth, Ky., 882 S.W.2d 111, 113 (1994), cert. denied, 513 U.S. 1174, 115 S.Ct. 1154, 130 L.Ed.2d 1111 (1995) (citations omitted). The witnesses were not overly emotional, condemnatory, accusative or demanding vindication, the type of testimony that was condemned in cases such as Benge v. Commonwealth, 265 Ky. 503, 97 S.W.2d 54 (1936); Dean v. Commonwealth, Ky., 777 S.W.2d 900 (1989); and Clark, supra. There is no reversible error here.

VII. DID TESTIMONY OF CROCKETT STEVENS’ PRIOR FELONY CONVICTIONS CONSTITUTE REVERSIBLE ERROR?

The testimony of Crockett Stevens was presented via deposition. During the deposition, the prosecutor asked Stevens if he had ever been convicted of a felony. Following up on Stevens’ affirmative answer, the prosecutor asked whether Stevens had more than that one felony conviction, when the conviction occurred, whether he had only been convicted of a felony that had been thrown out by the “Sixth Circuit,” and whether he had a conviction on his record at the time the deposition was taken. Defense counsel objected to every question following the initial inquiry, relying on KRE 609, and arguing that any follow up is barred, once the conviction is acknowledged.
Appellant also argues that because the reversed conviction occurred in 1975, more that ten years prior to the witness’s testimony, it was inadmissible without a determination that the probative value of the conviction substantially outweighed its prejudicial effect. KRE 609(b). The trial court did admonish the jury as to the use the evidence could be put to in its deliberations. Commonwealth v. Richardson, Ky., 674 S.W.2d 515 (1984). A review of the record reveals that the trial court did not rule on the objections raised during the course of the deposi *938 tion; thus, the objection could be deemed waived. Sanborn v. Commonwealth, Ky., 892 S.W.2d 542, cert. denied, - U.S. -, 116 S.Ct. 154, 133 L.Ed.2d 98 (1995); Bell v. Commonwealth, Ky., 473 S.W.2d 820 (1971). However, because this is a death penalty case, we review the error in accordance with Sanders, supra.
The net result of Stevens’ testimony is that he had been convicted of a felony, that conviction was reversed by the appellate court, and he was convicted once again on retrial of the same charge. The specifics of the charge were never relayed to the jury and the jury was properly admonished. Considering the entire circumstances surrounding this testimony and the content of Stevens’ substantive testimony, we do not believe that Appellant’s conviction or the imposition of the death penalty would not have occurred had Stevens’ prior conviction not been mentioned. The only matter of substance testified to by Stevens was that sometime in the spring of 1990, Gordon Canter was living with him in Chicago and, while high on something, told Stevens that he and David Gross had “offed” some people after ripping them off. Stevens stated that he interpreted this to mean that the unidentified people were killed but could provide no other details. The introduction of this evidence does not constitute reversible error.

VIII. DID THE TRIAL COURT ERRONEOUSLY EXCLUDE A FACSIMILE TRANSMISSION SOUGHT TO BE INTRODUCED INTO EVIDENCE BY APPELLANT?

Defense counsel sought to introduce into evidence a facsimile transmission sent to the Indiana State Police by Kentucky State Police Detective Johnny Phelps on October 30, 1991. The fax indicates that Gordon Canter was wanted as a potential witness to a quadruple homicide. In response to the KSP fax, the Indiana State Police sent a fax to Detective Phelps containing a description and photograph of Canter. The fax stated that Canter was with the shooter when some of the victims were shot, that Canter is armed and dangerous, and that the Kentucky State Police “primarily want him as a witness, but if uncooperative, will charge him also as a co-conspirator.”
Appellant called Detective Phelps to the stand and sought to introduce the faxes, arguing that they are probative and relevant to demonstrate the bias of the police when talking to Canter, and the bias Canter may have had toward the Commonwealth’s version of events to avoid possible criminal charges. The Commonwealth objected to the faxes, stating that the statement contemplating criminal charges originated with the Indiana Police, not the KSP, that the “ATTEMPT TO LOCATE” bulletin does not indicate the issuing organization or officer and that Appellant was able to effectively cross-examine Phelps on all of these issues without introducing the documents.
We agree that the trial court ruled correctly in excluding the documents. They were of marginal relevance at best and, given the ability of Appellant to elicit similar information from Detective Phelps without the documents, introduction would have been cumulative evidence. KRE 403.

IX. WAS THE COURTROOM SECURITY PREJUDICIAL?

Appellant contends that he was unduly prejudiced by the presence in the courtroom of three deputy sheriffs wearing what he described as combat-like fatigue uniforms. Appellant likens this display of security to requiring a defendant to appear before the jury in prison or jail clothing or in shackles or bonds, procedures forbidden absent exceptional circumstances. See Estelle v. Williams, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). Appellant also contends that the excessive display of security conveyed to the jury the inference that Appellant was extremely dangerous, and, therefore, must be guilty. Kennedy v. Cardwell, 487 F.2d 101 (6th Cir.1973), cert. denied, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974).
The Commonwealth responds that the guards were deputy jailers needed to move Appellant back and forth, and the clothing complained of was simply the uniform required by the jailer. Additionally, Appellant *939 was not in fact shackled, handcuffed, or even seated near a jailer or other security officer. Finally, the Commonwealth distinguishes the Kennedy case, since it involved a defendant who was actually handcuffed to a uniformed deputy sheriff during the trial proceedings, and was accompanied by another deputy and a U.S. Marshal. Id. at 102.
The court in the Kennedy case noted that the objection to placement of guards had two bases: first, that the impression could be created in the minds of the jurors that the defendant is dangerous and untrustworthy, the ground asserted in the ease at bar; and, second, that the guards could interfere with the ability of the defendant to communicate with counsel. Id. at 106. Additionally, the Kennedy court emphasized that to review this allegation of error there should be a record made of the basis for the trial judge’s determination that the guards are necessary and not unduly intrusive or violative of the defendant’s due process rights. Id. at 107.
Here, the record consists of statements by the trial court explaining why the jail personnel were there, a comment by the Commonwealth’s Attorney that he didn’t think the jury could even see them, and the defense counsel’s objection. Appellant did not seek to make a further record of his objections or ask for a definitive ruling. Having reviewed the record and viewed the videotape and noting that Appellant was not shackled in any way, and the guards were not located closely to Appellant, we find no reversible error in the trial court’s ruling.

X. WAS THE COMMONWEALTHS GUILT PHASE CLOSING ARGUMENT UNDULY PREJUDICIAL?

Appellant contends that the prosecutor’s closing argument during the guilt phase of the trial contained ten improper comments requiring reversal of his convictions. In analyzing claims of improper argument, this Court must “determine whether the conduct was of such an ‘egregious’ nature as to deny the accused his constitutional right of due process of law.” Slaughter v. Commonwealth, Ky., 744 S.W.2d 407, 411 (1987), cert. denied, 490 U.S. 1113, 109 S.Ct. 3174, 104 L.Ed.2d 1036 (1989). “The required analysis, by an appellate court, must focus on the overall fairness of the trial, and not the culpability of the prosecutor.” Id. at 411-12. Both counsel are permitted “great leeway” in closing argument. Id. at 412.
We have reviewed the errors alleged and, of the ten, only three deserve detailed discussion, the remainder having no merit whatsoever. The first statement by the prosecutor at issue was in reference to the deposition testimony of Crockett Stevens. The prosecutor told the jury that they had a chance to look at every witness “with the exception of the sole person who accused anybody else other that Bob Foley [i.e., Stevens],” asking rhetorically why Stevens could not have appeared in person at the trial. The argument then emphasized the importance of the jurors’ evaluation of the veracity of each witness and repeated that Stevens was the only witness not personally present. Appellant contends that this statement implied that the defense had done something improper in using the deposition of Stevens or was trying to hide something. Additionally, Appellant argues that these comments improperly imply that a deposition has less evidentiary value than live testimony.
The Commonwealth responds that each statement is in fact true; that is, a reading of the Stevens deposition reveals that Stevens testified that he had not been subpoenaed and said that only his health or financial reasons might prevent his live testimony at trial, that Stevens was the only witness to accuse someone other than Appellant of these crimes, and that there was simply no argument or implication that a deposition has less value that a live witness. As this Court stated in Slaughter, “[a] prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position. We find that the remarks referred to here were well within the proper bounds of a closing argument and certainly did not affect the outcome of the trial.” Id.
Appellant also takes issue with the prosecutor’s statement that he believed the prosecution witnesses to be “honest” and pointing out that their testimony had not *940 been challenged. This, it is contended, constituted improper bolstering of witness credibility. Armstrong v. Commonwealth, Ky., 517 S.W.2d 233, 236 (1974). While bolstering is indeed improper, it did not occur in this case. The prosecutor said of the witnesses, “Were they honest? I believe so, but that’s your judge,” apparently meaning that then-honesty is for the jury to judge. This is clearly a correct statement of the law, so fundamental as to require no citation of authority. Additionally, the statements by the prosecutor were responsive to an argument made by defense counsel, wherein he described almost every witness presented by the Commonwealth as either dishonest or as having “flat out lied.” As an invited response, the prosecutor’s comments do not warrant reversal. United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).
Finally, Appellant contends that the prosecutor improperly “castigated” the defense counsel for speculating on certain matters. Examples of the matters at issue are whether Watts’ children slept through the killings, whether Watts and Canter created the story to set up Appellant, why Watts moved from the Gross property when she did, and whether the cabin burned after she moved out to cover evidence. Appellant relies upon the holding in People v. Bean, 109 Ill.2d 80, 92 Ill.Dec. 538, 485 N.E.2d 349 (1985), wherein that court held that “[a] defendant is entitled to be tried by an unbiased jury and to be judged on the merits of his case, not on the unsubstantiated personal opinion which the prosecutor holds of the defense attorney’s ethics and abilities.” Id. 92 Ill.Dec. at 548, 485 N.E.2d at 359.
The Commonwealth contends that these statements were perfectly permissible as they were made in response to arguments set forth in the closing of Appellant and were not so egregious as to warrant reversal as a denial of due process. We agree. When viewed in the totality of the circumstances, the closing argument was proper and did not render the trial fundamentally unfair. Summitt v. Bordenkircher, 608 F.2d 247 (6th Cir.1979), cert. granted sub nom. Watkins v. Bordenkircher, 445 U.S. 926, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980), aff'd sub nom. Watkins v. Sowders, 449 U.S. 341, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981); Slaughter, supra.

XI. SHOULD THE TRIAL COURT HAVE DIRECTED A VERDICT ON THE AGGRAVATING CIRCUMSTANCE, “SUBSTANTIAL HISTORY OF SERIOUS ASSAULTIVE CRIMINAL CONVICTIONS?”

Appellant’s jury was instructed on the aggravating circumstance “substantial history of serious assaultive criminal convictions” as to each of the four murders of which he had been convicted and found the circumstance to exist as to each. Appellant contends that there was insufficient evidence to support the aggravating circumstance and that the death sentence must be vacated for that reason.
The testimony in support of the aggravating circumstance came from Josh Nye, a probation and parole officer. Nye testified that Appellant had been convicted of a murder in Harlan County in 1977 and of the murders of Rodney and Harry Vaughn in Laurel Circuit Court in 1993. The jury was not advised of the sentences received in connection with each conviction; nor were the judgments introduced into evidence so that the jury could review the actual documentation. Those steps were taken at the motion of the Commonwealth and over the objection of the defense.
Appellant argues that the evidence of the Harlan County conviction was insufficient because the lack of a final judgment reflecting the conviction rendered it inadmissible. The only written evidence of the conviction made part of the record was a certified copy of a document styled “MURDER ETC JURY TRIAL CONTINUED,” which reflects that a jury found Appellant guilty of three counts and fixed his sentence on each count, and that the Appellant was remanded to jail. Appellant also contends that the evidence of the Laurel Circuit Court convictions could not be introduced because they were not final at the time of their introduction. As previously noted in this opinion, Appellant’s Laurel County convictions recently have been affirmed by this Court. Foley, supra.
*941 We begin by noting that this issue is not preserved. Among its other responses, the Commonwealth correctly, and we think compellingly, argues that any error in the submission of this aggravating circumstance is rendered harmless by two factors. The first is that this Court has affirmed the Laurel County convictions and that affirmation has become final. See Melson v. Commonwealth, Ky., 772 S.W.2d 631, 633 (1989) (harmless error to admit non-final convictions, subsequently affirmed, as a basis for a persistent felony offender instruction; a remand for resentencing would be an “exercise in futility”). Additionally, the jury found two aggravating circumstances to support the imposition of the death penalty: a previous history of serious assaultive criminal convictions, and that the defendant’s act or acts of killing the victims were intentional and resulted in multiple deaths. Nowhere in his voluminous brief does Appellant attack the sufficiency of the evidence supporting the finding of the latter aggravating circumstance. Even were we to hold that the evidence as to the Harlan County conviction was inadmissible, the evidence of the Laurel County conviction was sufficient to support the jury’s finding as to the first aggravator, along with the second aggravator. There is no reversible error here.

XII. PENALTY PHASE INSTRUCTIONS

Appellant has raised a host of alleged errors in regard to the instructions given to the jury during the penalty phase of the trial. No evidence was presented during the penalty phase and defense counsel neither tendered instructions to the court, nor raised objection to those given.
We have carefully considered each argument and the authorities cited in support of same, and find that none merit extensive discussion except the argument as to the form of the verdict. In general, Appellant argues that the instructions de-emphasized the obligation of the jury to consider evidence in mitigation of the seriousness of the crimes in favor of the aggravating factors. He seeks instructions that delineate the possible mitigating factors a jury can consider, definitions of mitigating circumstances, explanations more clearly defining the role the mitigating evidence should play in the jury decision-making process, and an instruction stating the burden of proof in requiring ag-gravators outweigh mitigators.
It is our opinion that the jury was given constitutionally adequate instructions regarding the mitigating circumstances. The constitutional standard is whether the jury instructions precluded the jury from considering mitigating evidence that was placed before it. Johnson v. Texas, 509 U.S. 350, 361, 113 S.Ct. 2658, 2665-66, 125 L.Ed.2d 290, 302 (1993). The constitutional requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence. Id.
The verdict forms submitted for use by the jury set forth as separate alternatives the various punishments that could be imposed, with a separate signature line for each alternative. Had the jury determined to impose a term of years, the following verdict form was to be used: ‘We, the jury, fix the Defendant’s punishment for the murder of Kimberly Bowersock at confinement in the penitentiary for a term of _ years.” Appellant complains that the verdict forms providing for the finding of aggravating circumstances are designed so that the jury could not find an aggravating circumstance without imposing the aggravating penalty.
One of the instructions used by the jury in its finding of aggravators was as follows:
PENALTY AS TO COUNT I: MURDER OF KIMBERLY BOWERSOCK IF DEATH:
We, the jury, find beyond a reasonable doubt that the following aggravating circumstance or circumstances as set forth in Instruction No. 13 exist in this case. (Please write in entirety such circumstance or circumstances.)
[the jury wrote in the two aggravators found]
*942 and we fix the Defendant’s punishment for the Murder of Kimberly Bowersoek at death.
Foreperson
Appellant argues that we have held that such a verdict form is improper in Chumbler v. Commonwealth, Ky., 905 S.W.2d 488 (1995). We first note that, in Chumbler, reversal was mandated on numerous grounds, not just this unpreserved instruction error. Id. at 499-500. Nor is there any indication that this Court considered this error of sufficient gravity to require reversal on that ground alone. Id. at 497-98. Further, from reading Chumbler, it appears that the potential aggravators were listed as part of the instruction, with the jury given the option of choosing the ones found, rather than as here, where the jury must affirmatively set out the factor upon which the sentence was based. Id. These, however, may be distinctions without differences, since when the entire penalty phase instructions are read, there is the clear impression that they create the same situation decried in Chumbler. It would have been difficult for this jury to find an aggravating circumstance and render a sentence other than life without parole for twenty-five years or death.
We must then consider whether this warrants a new sentencing phase for Appellant. Having carefully considered the entire record, the errors alleged, and the weight of the evidence against Appellant, we believe that Appellant received a fundamentally fair trial and that even if a resentencing hearing was ordered, the result would be the same. Michigan v. Tucker, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); McDonald v. Commonwealth, Ky., 554 S.W.2d 84 (1977). As in Haight v. Commonmwealth, Ky., 938 S.W.2d 243 (1996), we do not believe this is a reversible error in this case. Id. at 249.

XIII. WHETHER APPELLANT WAS DENIED A RATIONAL SENTENCING BY THE TRIAL COURT?

Appellant’s next argument is that the trial court is constitutionally required to consider and set forth in the sentencing report any mitigating factors considered and that its failure to do so is a violation of his Eighth and Fourteenth Amendment rights, as well as a violation of KRS 532.025. Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973, 990 (1978). This argument has, in substance, been addressed by this Court several times. See, e.g., Epperson v. Commonwealth, Ky., 809 S.W.2d 835, 844-45 (1990), cert. denied, 502 U.S. 1037, 112 S.Ct. 885, 116 L.Ed.2d 789 (1992); see also Smith v. Commonwealth, Ky., 734 S.W.2d 437 (1987), cert. denied, 484 U.S. 1036, 108 S.Ct. 762, 98 L.Ed.2d 778 (1988); and Skaggs v. Commonwealth, Ky., 694 S.W.2d 672 (1985), cert. denied, 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986). This is not reversible error.

XIV. PROPORTIONALITY REVIEW

Under KRS 532.075:
(1) Whenever the death penalty is imposed for a capital offense ... the sentence shall be reviewed on the record by the Supreme Court....
[[Image here]]
(3) With regard to the sentence, the court shall determine:
[[Image here]]
(c) "Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
This case presents a difficult case for proportionality review because of the number of victims; the cold and callous manner of their death; a crime committed in the presence of eyewitnesses, including children; and the defendant’s prior convictions and the sentences previously imposed. As the Appellant notes, there are no cases that fit this factual scenario precisely.
However, a careful review of the cases in which this Court has affirmed the imposition of the death penalty does reveal a number of cases which have substantial similarity. In Bevins v. Commonwealth, Ky., 712 S.W.2d 932 (1986), cert. denied, 479 U.S. 1070, 107 S.Ct. 963, 93 L.Ed.2d 1010 (1987), Bevins faced five death sentences for murders com *943 mitted in one episode of violence. He, like Appellant herein, had previously been convicted of murder, placing Bevins in the category of those eligible for the death penalty. Id, at 935-936. Smith v. Commonwealth, Ky., 734 S.W.2d 437 (1987), cert. denied, 484 U.S. 1036, 108 S.Ct. 762, 98 L.Ed.2d 778 (1988), affirmed the sentence of death on four counts of capital murder, three of which were premised on transferred intent. The aggravating circumstance found in that case, just as in the case at bar, was the circumstance of multiple murders. Id. at 451. The aggravating factors in Halvorsen v. Commonwealth, Ky., 730 S.W.2d 921 (1986), cert. denied, 484 U.S. 982, 970, 108 S.Ct. 468, 496, 98 L.Ed.2d 407, 495 (1987), were multiple killings (three deaths) and a history of prior assaultive criminal behavior. The convictions and sentences were affirmed. Id. at 928.
Having reviewed the three cases cited above, as well as those listed in the proportionality review of each, and considering the facts of this case, we have determined that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. The evidence supports the finding of the statutory aggravating factors and the death penalty is neither excessive nor disproportionate to the penalty imposed in other similar cases. The judgment and sentences are hereby affirmed.
All concur.

. Because the jurors might not wish to be identified by name, we have designated each with a letter.