RENDERED: OCTOBER 29, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0137-T

BENNY LEE HODGE          APPELLANT


V.

ON TRANSFER FROM COURT OF APPEALS
NO. 2019-CA-0165
LAUREL CIRCUIT COURT NO. 92-CR-00180


COMMONWEALTH OF KENTUCKY          APPELLEE


**OPINION OF THE COURT BY JUSTICE VANMETER**

**<u>AFFIRMING</u>**

Under KRS[1] 422.285, a person convicted of a capital offense may be entitled to DNA testing of certain evidence. In this case, we must decide whether the Laurel Circuit Court erred in denying Benny Lee Hodge's motion for DNA testing with respect to hair found at the residence of Bessie and Edwin Morris, for whose June 1985 murders, burglary and robbery, Hodge was convicted and sentenced to death. Based on the extensive record in this case, we hold that the trial court did not err and therefore affirm its Order denying Hodge's motion.

---

[1] Kentucky Revised Statutes.

# I.    FACTUAL AND PROCEDURAL BACKGROUND.

On June 16, 1985, Hodge, along with Roger Epperson and Donald Bartley, participated in the offenses against the Morris's. Approximately two months later, on August 8, these three participated in similar offenses burglarizing and robbing Dr. Roscoe Acker and his twenty-three-year-old daughter, Tammy Acker, at the Acker residence in Letcher County. Tammy Acker was brutally murdered, being stabbed over ten times. Dr. Acker survived after being choked to unconsciousness and being left for dead. Almost $2,000,000 in cash, weapons and jewelry were taken by the men. *Epperson v. Commonwealth*, 809 S.W.2d 835 (Ky. 1990). At their June 1986 jury trial, Hodge and Epperson were convicted and both received the death penalty for these crimes. In all appeals and motions for post-conviction relief, the Letcher County convictions have been upheld by this Court and federal courts.[2]

Although the Morris murders occurred before the Acker murder, the Letcher County crimes were indicted first in August 1985, with the Jackson County offenses being indicted in July 1986. Following a change in venue from Jackson County, Hodge and Epperson were tried in Laurel Circuit Court initially in 1987; they were convicted and both received a death sentence. On

---

[2] *Epperson v. Commonwealth*, 2014-SC-000662-MR, 2016 WL 5245215 (Ky. Sept 22, 2016) (affirming denial of Epperson's motion for relief under Kentucky Rule of Criminal Procedure (RCr) 11.42)); *Hodge v. Commonwealth*, 2009-SC-000791-MR, 2011 WL 3805960 (Ky. Aug 25, 2011) (affirming denial of Hodge's motion for relief under RCr 11.42), *cert. denied,* 568 U.S. 1056 (2012); *Hodge v. Coleman*, 244 S.W.3d 102 (Ky. 2008) (granting Hodge and Epperson state funds for travel expenses of out-of-county witnesses); *Hodge v. Commonwealth*, 68 S.W.3d 338 (Ky. 2001) (reversing and remanding for trial court to conduct hearing on Hodge's and Epperson's motions for relief under RCr 11.42); *Epperson*, 809 S.W.2d 835 (Ky. 1991) (affirming Hodge's and Epperson's convictions and sentence on direct appeal), *cert. denied,* 502 U.S. 1037 (1992).

direct appeal, we vacated the convictions on the Commonwealth's motion due to trial error and remanded for a new trial. *Epperson v. Commonwealth*, 88-SC-000712-MR (Ky. Jan. 11, 1991); *see also Hodge v. Commonwealth*, 17 S.W.3d 824, 834 (Ky. 2000) (stating convictions vacated on confession of error with respect to the failure of the trial court to conduct individual voir dire as to pre-trial publicity). Subsequently, Epperson and Hodge were tried separately. At these separate trials, both were again convicted, and both again received the death penalty.[3] Hodge's conviction was upheld on direct appeal. *Hodge*, 17 S.W.3d 824. His RCr 11.42 motion for post-conviction relief was denied and that denial was upheld on appeal. *Hodge v. Commonwealth*, 116 S.W.3d 463 (Ky. 2003), *overruled on other grounds by Leonard v. Commonwealth*, 279 S.W.3d 151 (Ky. 2009). Hodge next unsuccessfully sought federal habeas corpus relief. *Hodge v. Haeberlin*, CIV A. 04-CV-185-KKC, 2006 WL 1895526 (E.D. Ky. 2006), *aff'd,* 579 F.3d 627 (6th Cir. 2009).

Hodge's current motion is brought under CR 60.02 and KRS 422.285(6)[4] seeking DNA testing of hair that was found in the Morris home.[5] Hodge's

---

[3] At Epperson's separate trial in Warren Circuit Court, he was convicted of two counts of complicity to murder, first-degree robbery and first-degree burglary. *Epperson v. Commonwealth*, 197 S.W.3d 46, 51 (Ky. 2006). Epperson's post-conviction relief motion under RCr 11.42 was denied and that denial was affirmed. *Epperson v. Commonwealth*, 2017-SC-000044-MR, 2018 WL 3920226 (Ky. Aug 16, 2018), *cert. denied*, 139 S.Ct. 924 (Jan. 14, 2019).

[4] Hodge's original motion was based on KRS 422.285(3). This statute was originally enacted in 2002 to provide a means of DNA testing for persons convicted of and sentenced to death for a capital offense. KRS 422.285(1) (effective Jul. 15, 2002). The statute was revised in 2013 to expand testing to any person convicted of a capital offense, a Class A or B felony. Act of Mar. 22, 2013, ch. 77 §1, 2013 Ky. Acts. As a result of the 2013 amendments, the subsection which provides Hodge's remedy, if any, is now KRS 422.285(6).

[5] One of Hodge's allegations in his RCr 11.42 motion was that his counsel had been ineffective.

motion was filed in 2008, but was not ruled on at that time by the trial court because it held the matter in abeyance pending a similar request for DNA testing in Epperson's Warren Circuit Court case. The trial court decided to remove the case from abeyance in 2015.

## II.    STANDARD OF REVIEW.

On appeal, we review the denial of a CR 60.02 motion for an abuse of discretion. The test for abuse of discretion is whether the trial court's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citations omitted). This standard of review applies to a CR 60.02 motion for DNA testing brought under KRS 422.825. *Partin v. Commonwealth*, 337 S.W.3d 639, 640 (Ky. App. 2010).

## III.    ANALYSIS.

Hodge argues that the trial court erred in denying his motion because seven hairs were found which did not match the known hair standards of the victims. His argument continues that if DNA testing were to establish that

> one of the hairs collected . . . from inside the home belongs to Donald Bartley, it will seriously undermine Bartley's credibility as a witness for the State. Given that there is no physical evidence linking Hodge to the crimes, and that Bartley was a critical prosecution witness, a reasonable probability exists that either the verdict or sentence would have been more favorable to Benny Hodge.

Hodge Brief on Appeal, 7.

### A. Prior Opinions addressing Hodge's DNA Arguments.

Hodge has previously alleged DNA testing would benefit his cause. In his RCr 11.42 motion, one of his allegations of ineffective assistance of counsel was

4

that defense counsel failed to request an expert to test hairs found at the crime scene, because those hairs did not match the victims and might have matched Bartley. We rejected that argument, noting the proof that Bartley was also at the crime scene that night, and referring to Sherry Hamilton's testimony that Hodge admitted to her that both Bartley and he entered the residence, robbed and shot the victim. We noted "[a]ny evidence that hairs of Bartley were inside the home would not demonstrate that Hodge was not also inside and helped to kill and rob the two victims and burglarize the residence." *Hodge,* 116 S.W.3d at 470. Later in the opinion we noted again the trial testimony that Hodge and two accomplices committed the crimes. *Id.* at 473. "As stated earlier, testimony that others were present inside the residence or assisted him in committing the crimes would not have influenced the jury to find him not guilty. It is possible that the complicity statute, KRS 502.020, would have supported his convictions in any event." *Id.*

Following our affirming the denial of Hodge's RCr 11.42 motion, Hodge filed a federal habeas corpus petition and included an allegation as to the failure of DNA testing. As recounted by the federal judge,

> According to [Hodge], expert DNA testing could have shown that the hair fibers belonged to Donald Bartley, and then "[Hodge] would have been exonerated and either acquitted or, at least, avoided the death penalty." Because Petitioner Hodge was "denied the basic tools to present a defense" and because counsel gave ineffective assistance in obtaining this tool, he is allegedly entitled to a new trial.

2006 WL 1895526, at *77. The court rejected Hodge's allegation, stating "[a]gain [Hodge] has presented no factual or legal support for his claim. He has failed to show that the Kentucky Supreme Court's conclusions are contrary to

or an unreasonable application of then-existing Supreme Court law." *Id.* at *78. As noted, the federal district court's decision was affirmed by the Sixth Circuit Court of Appeals. The Sixth Circuit addressed the DNA issue in that part of its opinion that it determined not to hold the case in abeyance. 579 F.3d at 636-38. The court noted that "no DNA or biological evidence was used against Hodge at trial, nor can the tests now being conducted exonerate him. . . . [T]he jury knew that no DNA evidence linked Hodge to the scene. Further, the results of the new DNA testing cannot exclude Hodge from the crime scene." *Id.* at 636.

### B. KRS 422.285(6).

The foregoing demonstrates that Hodge's DNA arguments have been raised and rejected both by this Court and the federal courts. We are therefore tempted to reject his claims out-of-hand. But because of the sanction imposed, and because Hodge's motion involves a collateral attack on his conviction under Kentucky's post-conviction DNA statutes, our opinions recognize that some discussion of the crimes is necessary to frame his claim relating to DNA testing. *Moore v. Commonwealth*, 357 S.W.3d 470, 474 (Ky. 2011); *see also Partin*, 337 S.W.3d at 640-42 (discussing facts of crime and concluding requested DNA testing would not exonerate defendant).

In Hodge's direct appeal, we summarized the evidence, as follows:

> On June 16, 1985, Edwin and Bessie Morris were murdered in their home in Gray Hawk, Jackson County, Kentucky. Edwin Morris's body was found lying on the kitchen floor, gagged, with his hands tied behind his back, and with a pillow near his head. Bessie Morris's body was found on a bed in the bedroom with her hands tied behind her back and her feet tied together. A pillow

6

was also found near her body. The medical examiner testified that Edwin Morris had been shot twice, once in the forehead and once in the right side of the head, and that either wound would have been fatal. One bullet was recovered from his body; the other had passed through his body. The examiner testified that even if the bullet wounds had not been fatal, Mr. Morris would have suffocated from the gag. Bessie Morris died of two gunshot wounds to the back, both of which were fatal, but death did not immediately result from either. One bullet was recovered from her body and the other had passed through her body.

A ballistics expert testified that one of the two bullets recovered from the victims' bodies was definitely a .38 caliber bullet and the other was either a .38 caliber or a .357 magnum caliber. Both bullets had been fired from the same weapon, which could have been either a .38 caliber or a .357 caliber handgun. Two additional bullets were recovered from the crawl space under the kitchen floor where Edwin Morris's body was found and a third from the box springs of the mattress on the bed where Bessie Morris's body was found. The ballistics expert testified that these were all 9–mm Lugar bullets, which appeared to have been fired from a semi-automatic pistol; and that at least two of the bullets were fired from the same weapon and the third could have been fired from the same weapon. The two pillows found near the bodies contained large holes surrounded by gunshot residue consistent with a bullet being fired through each pillow to muffle the sound.

[Hodge] was first tried, convicted and sentenced to death for these murders in 1987. The convictions were vacated on a confession of error by the Commonwealth, *i.e.*, that the trial judge had not conducted individual voir dire on the issue of pre-trial publicity. *See Morris v. Commonwealth*, Ky., 766 S.W.2d 58 (1989). Donald Bartley had been a witness for the Commonwealth at the 1987 trial and a redacted transcript of his testimony was read to the jury at the 1996 trial. According to Bartley, he, [Hodge] and Roger Epperson went to the Morrises' residence with the intent to commit robbery. [Hodge] was armed with a .38 caliber handgun and Epperson with a 9–mm pistol. [Hodge] and Epperson went to the door and were admitted by Mrs. Morris. Bartley stayed outside to keep a lookout, but was able to view some of the proceedings through a patio door. He saw both [Hodge] and Epperson brandish their weapons, then knock Mr. Morris to the kitchen floor. Bartley then heard shots, following which [Hodge] and Epperson came out of the house with a sack full of money and their pockets stuffed with more money. A subsequent count revealed they had stolen $35,000.00 in cash from the Morrises. They also stole a diamond cluster ring, a set of diamond earrings, and a .38 caliber handgun.

7

Later, they disassembled the 9–mm pistol, wiped all three handguns clean of fingerprints, and threw them from a bridge into a river in the Daniel Boone National Forest. They then burned [Hodge]'s blood-stained shirt and tennis shoes.

[Hodge]'s former wife, Sherry Hamilton, testified at the 1996 trial that [Hodge] told her that he and Bartley (not Epperson) had entered the Morrises' residence and that he shot Edwin Morris following a scuffle which ensued when Morris reached for a gun on the refrigerator. Bartley then took Bessie Morris into the bedroom and shot her. When Bartley emerged from the bedroom, [Hodge] asked him if Mrs. Morris was dead and Bartley replied that he thought she was; whereupon [Hodge] went into the bedroom and shot Mrs. Morris again to make sure she was dead. Hamilton testified that [Hodge] usually carried a .38 caliber handgun and that Bartley usually carried a 9–mm handgun. She also testified that [Hodge] gave her the diamond ring and earrings and that she subsequently sold them to a "fence" in Tennessee.

*Hodge,* 17 S.W.3d at 833–35.

Hodge characterizes Bartley as the Commonwealth's "star witness" motivated to concoct his testimony to receive leniency from the Commonwealth. He describes Hamilton as an "accomplished liar" and a spurned woman seeking revenge against Hodge. And, he repeatedly points out that no physical evidence connected Hodge to the scene.

The trial court, in denying Hodge's motion, noted the "overwhelming and substantial evidence placing [Hodge] at the scene from multiple witnesses and corroborating findings from medical experts consistent with these witnesses' testimonies." In this case, Pam Reams, a United States Forest Service employee, testified that Carole Malone, an alias of Epperson's wife, rented a campground site at Holly Lake from June 8 to June 16. This testimony corroborated Bartley's and Hamilton's testimony that Hodge, Hamilton, Epperson, Malone, and Bartley camped there during that time period, and were in close proximately to the murder scene.

8

Harold Clontz, a long-time friend of Epperson, testified that on the afternoon of June 16, Epperson, accompanied by Hodge and Bartley, borrowed Clontz's Chevrolet van, and returned it late that night. The van was variously described as white, blue, or blue and white. The Commonwealth's Exhibits 49 and 50, were identified by Clontz as his van. This testimony corroborated Bartley's testimony as to the vehicle the three used in going to and from the Morrises' residence, as well as the date and general time frame. In addition, Clontz testified that he picked up a tent at the camp ground that belonged to the group.

Roger McQueen and Gary Wilkerson, employees at a used car lot in London, testified that on June 18, Epperson and Malone bought a 1978 Olds Delta 88, tendering twenty-four $100 bills, which was then titled in Malone's name. This corroborated Bartley's and Hamilton's testimony concerning the purchase of the vehicle.

Charles Frank Baldwin and Michael Riley, two teenagers in 1985, both testified that after leaving the Hilltop Drive-In late on the night of June 16, as they approached the Morris's house, a van pulled out in front of them from between the Morris's house and garage. Although neither witness saw the driver or occupants, they both identified the van, as shown in Commonwealth's Exhibits 49 and 50. This testimony corroborated Bartley's testimony that the van and by inference, Hodge, Epperson and Bartley were at the Morris's residence that night. It also corroborates Bartley's testimony that they left hurriedly.

9

Bobby Morris, the victims' son, testified that his parents were known to have sums of money in their house, a fact known in the community of Gray Hawk; that his father, as a used car dealer, regularly attended car auctions in London; that his father was a good friend of Ep Epperson, father of Roger Epperson; that Bobby had attended a London car auction with his father and had seen Epperson and Hodge together approximately two to four weeks prior to the crimes; that his father kept a .38 or .357 pistol on top of the refrigerator in the kitchen; that the Morris's residence had a sun room built that looked out to the service station and post office; and that his mother had a diamond ring and earrings. In describing the crime scene, he stated that his father's billfold had been taken. On cross-examination, Bobby also testified that he had seen Epperson, Hodge and a third man dressed alike, and all three had yellow peroxide hair. This testimony corroborated Bartley's testimony as to how Epperson gained access to the house, since he knew Ed Morris; Bartley's description of the house and sun room as a glass patio; Bartley's description of a real big set of diamond earrings and a big diamond ring; Bartley's description of having taken a .38 from the house; his description of a billfold taken from the house that was burned along with Hodge's clothes. This testimony also corroborated Hamilton's description of Hodge's confession to her the following day, June 17, that "Mr. Morris went for a gun up on top of the refrigerator. And when he went for the gun, they scuffled and Benny Hodge shot Mr. Morris." Bobby Morris' testimony also corroborated Hamilton's testimony as to Hodge attempting to change his appearance by peroxiding his hair immediately before a criminal job.

10

As to the testimony and proof, two Laurel County juries, the Laurel Circuit Court, not to mention one Warren County jury and the Warren Circuit Court (as to Epperson's separate trial), as well as this Court in its prior opinions, and a federal district judge and three federal appellate circuit judges, have all determined that the three men, Hodge, Epperson and Bartley, devised and carried out a plan to rob Ed and Bessie Morris. The proof established beyond a reasonable doubt that Hodge committed two murders, robbery and burglary. Hodge's brief appears to suggest that testing seven hairs may prove that Bartley entered the house **with Hodge**, thereby casting doubt on his otherwise corroborated testimony. Two points. One, the jury heard the discrepancy in Hamilton's and Bartley's testimony, and regardless of which witness they believed, both testified that Hodge entered carrying a .38 pistol, his preferred weapon. Both Ed Morris and Bessie Morris were shot with a .38, as well as a 9-mm. Hodge's direct involvement inside the residence is not just beyond a reasonable doubt, it is beyond any doubt. Second, following the guilt phase, the jury heard of Hodge's conviction in the Letcher County case involving the murder of Tammy Acker and attempted murder of her father, Dr. Roscoe Acker, and the concomitant robbery and burglary. We previously addressed and affirmed the use of this conviction in the penalty phase. *Hodge*, 17 S.W.3d at 852. **No** reasonable probability exists that Hodge's "verdict or sentence would have been more favorable if the results of DNA testing and analysis had been available at the trial leading to the judgment of conviction; or DNA testing and analysis will produce exculpatory evidence[.]" KRS 422.285(6)(a).

11

## IV.  CONCLUSION.

The Laurel Circuit Court's Order is affirmed.

Minton, C.J.; Hughes, Keller, Lambert, Nickell and VanMeter, JJ., sitting.

All concur.  Wright, J., not sitting.

COUNSEL FOR APPELLANT:

Dennis James Burke
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Emily Lucas
Assistant Attorney General